234 N.J. Super. 147 (1989)
560 A.2d 693
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT CROSS-APPELLANT,
v.
THOMAS WILLIAM MANNING, DEFENDANT-APPELLANT CROSS-RESPONDENT.
Superior Court of New Jersey.
Argued April 11, 1989.
Decided June 21, 1989.
*149 Before Judges ANTELL, DREIER and BROCHIN.
Ronald L. Kuby and William M. Kunstler, admitted pro hac vice, argued the cause for appellant/cross-respondent (Ronald L. Kuby, William M. Kunstler and Elizabeth O'Connor Tomlinson, on the brief).
Boris Moczula, Deputy Attorney General argued the cause for respondent/cross-appellant (Peter N. Perretti, Jr., Attorney General of New Jersey, attorney; Boris Moczula and Mark Cronin, Deputies Attorney General, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendant appeals from convictions after a jury trial of two counts of felony murder, N.J.S.A. 2C:11-3a(3), and one count each of first degree robbery, N.J.S.A. 2C:15-1a(1)(b), and second degree criminal escape, N.J.S.A. 2C:29-5(a) and (d). Defendant was found not guilty of intentional murder, N.J.S.A. 2C:11-3a(2).
Defendant Manning and his codefendant, Richard Charles Williams, were accused of killing New Jersey State Trooper Philip Lamonaco, robbing him of a gun he had confiscated from Manning during a traffic stop, and fleeing the scene. The trial judge on February 18, 1987 sentenced Manning to life in prison, 30 years without parole, to be served consecutive to an earlier federal conviction. The judge also imposed a Violent Crimes Compensation Board penalty of $10,000. The jury could reach no verdict regarding Williams, and a mistrial was declared.
On appeal, the defendant raises three issues:

*150 I. The trial court unconstitutionally denied an indigent defendant expert services, ruling that State v. Stockling, 160 N.J. Super. 486 (App.Div. 1978), barred such services, no matter how necessary they were to the preparation of the defense.
II. The jury's verdicts were fatally repugnant, convicting Thomas William Manning of conduct for which he was not charged.
III. The prosecution excused black prospective jurors because of their race, in violation of Article I, Paragraphs 5, 9 and 11 of the Constitution of the State of New Jersey.
On its cross-appeal, the State raises a single issue:
IV. The sentencing court improperly merged defendant's conviction of escape into defendant's conviction of felony murder.
As we find no merit to any of defendant's claims, we affirm the decisions of the trial court, although as to the first point, for reasons other than those expressed by the judge.
New Jersey State Trooper Philip Lamonaco was shot and killed at about 4:30 p.m. on December 21, 1981, near mile marker 3.9 on Route 80 west. Ten witnesses, all of whom had been traveling on Route 80 at the time of the shooting, testified about the events prior to and after the shooting, as did Manning himself.
Reading the witnesses' testimony is not unlike watching consecutive frames in a movie. Each saw a different scene of the event. Most of the witnesses saw the trooper's patrol car with its lights flashing, parked behind another car on the shoulder of the westbound acceleration lane from Exit 4. Charles Hamilton testified that while he was driving east toward the truck stop at Exit 4, he saw the trooper leaning over, with his hat in his left hand, talking to someone through the driver's window of a "bluish-green mid-size" car. The car was also described as "blue," "bluish-grayish," and "dark green."
The second witness, George Rowe, testified that while he was driving west in his Mack truck toward the two stopped vehicles, he saw the trooper stepping back from the "blue Nova" with his hands "out to his sides" and a "shiny" nickel-plated gun in his left hand. At the same time he saw the driver of the car "sitting back" in his seat. Six witnesses testified that there were two people in the Nova, the driver and a passenger. *151 Three other witnesses testified that there might have been three people in the Nova, two passengers and the driver.[1]
Just moments after Rowe passed the scene, two other witnesses saw the driver standing with his back to the car, facing the trooper, with "his hands up" in "a fist-fight type of confrontation." His hands were empty. A third witness saw a "shiny" gun in the hands of the trooper; yet another also saw the gun but did not describe it as "shiny." The driver then ran into the traffic lanes and the trooper fired at him. At that time no gun was seen in the driver's hands.
While the driver and the trooper were facing each other, a passenger was outside the Nova on the passenger's side, moving toward the trooper's car. A gunfight ensued between the trooper and the passenger. Shots were fired; some witnesses said "many" shots, others limited the number to two or three. "Snow spurts," presumably caused by bullets hitting the snow, were seen behind the trooper (who was standing a "few feet" in front of the Nova), as well as between the two cars. After the volley of gunfire, the passenger grabbed his stomach and fell into the snow bank near the rear of the trooper's car. The trooper was also shot and fell face-first into the snowbank.
After the trooper fell, the passenger was seen "running" toward and "back[ing]" into the front passenger door of the Nova. During the shooting the driver must have reentered the Nova on his side, because a witness testified that after the passenger got back into the car, the driver "jump[ed] out of the left side of the car." One of the witnesses, Donald Longyore, then saw the driver walk over to the trooper, bend down over him, and stand up with a "shiny" gun in his hand. According to Longyore, the driver pointed the gun over the prone trooper and fired two or three shots. The driver then reentered the Nova, and was seen switching a "nickel-plated" gun from his left hand to either his right hand or the front seat.
The Nova then sped west on Route 80. Yet another witness, who had seen part of the confrontation and was driving a *152 long-haul freight truck back to Colorado, tried to push the car off the road. He was unsuccessful, and the Nova drove off Route 80 at the nearest exit, onto Hainesburg Road. The Nova was next seen on Route 94 in Hainesburg by a witness who saw only two people in the car.
Back at the scene of the shooting on Route 80, after witness George Hamilton left his passenger at the truck stop on Exit 4 he returned to Route 80, this time heading west. The trooper's car was still parked on the shoulder of the westbound entrance ramp to Route 80, and as Hamilton accelerated to enter Route 80, he saw the trooper lying face down, 15 to 18 feet in front of his car. Hamilton, a "first aider" with the Blairstown ambulance corps, checked the trooper for a pulse; when he could not find one, he went into the trooper's car and called for help.
The defendant testified to a different chain of events. He agreed that the car in question was his, and even stated that he had registered it under the name Barry Easterly. He further acknowledged that the trooper had pulled him over for speeding. But according to the defendant, he had picked up hitchhikers when he entered Route 80, a man and a woman, and therefore when he was stopped by the trooper he had two passengers. The man was seated on the passenger side of the front seat and the woman was seated in the back directly behind Manning. According to defendant, Williams was not in the car.
Manning testified that after the trooper asked him for his license and registration, he recognized Manning as a fugitive and "grabbed [me] by the shirt ... stuck his weapon right up close to my head and said: `Don't move Manning. Put your hand on the wheel.'" The trooper then ordered Manning out of the car, "spun [me] around ... and shoved [me] towards the vehicle ... which caused [me] to start to fall...." The trooper fired his gun near defendant's head, and Manning dropped to the ground, turning to face the trooper as he dropped. The defendant testified that he hit the trooper with his fist and ran eastward, into the traffic. He then reversed his course and dove across the back of his car, onto the passenger side, "for cover." According to the defendant the trooper then began firing ("he was trying to kill me"), and Manning, still crouched, *153 moved up the passenger side to get his gun from the above compartment. Although the woman was still in the back seat, the man was standing outside the car and defendant found it necessary to "elbow" him out of his way.
The defendant also told the jury that it was then that he began firing at the trooper. The two exchanged volleys while defendant moved backwards down the passenger side of his car, then across the trunk and up the car to the driver's door for extra ammunition. He then realized two facts: the trooper was no longer firing at him, he was lying on the ground, and the trooper still had Manning's license. According to the defendant, "I ran to him, stepped between his gun hand and his body. Looked around the area for the license, couldn't find it, turned and left. Ran back to the car." According to Manning the trooper was dead ("I felt bodies before, and it was  there was no life at all.") He put his own gun on the front seat of his car and then drove the car, with both passengers, west on Route 80. Because he "was getting pressed by some trailer trucks" and the shooting was being discussed on his CB radio, he "took the first exit" off Route 80 onto Route 94. He then left the car and told his passengers to "just go;" it was the last time he saw the hitchhikers. Defendant took a screw driver and a "brazing rod" from his car to try to find another car "to get out of the area" with, but after trying for several hours he was unsuccessful and left the area on foot.
The vehicle, a four-door blue Nova with Connecticut license plates, was found at about 7:30 that night on Station Road, approximately three-tenths of a mile off Route 94. It was stuck in the snow, had bullet holes in the windshield and hood, and blood on the inside panel of the front passenger door, as well as on the front passenger's side of the seat and headrest. A shoulder holster for a nine millimeter gun was found in the woods off the shoulder of Station Road, on the driver's side of the car.
Although not clear from the record, Trooper Lamonaco apparently died at the scene. His service revolver, a six shot, .357 Magnum Ruger revolver, was found 5-8 feet east of his body, facing east, about 27 feet west of his car. All six shots had been fired. Another gun, a Smith and Wesson .38 Special, was *154 taken from the trooper's body at the hospital. It had five live rounds in it.
According to the doctor who performed the autopsy, Lamonaco had been shot nine times, but because he was wearing a "bullet-proof" vest not all the bullets entered his body. One went through only his clothing, never touching his skin; one dented his vest and his skin at his left breast-pocket level; one struck the muscle of his right upper arm, which was not protected by the bullet proof vest; another entered his right leg just above the knee, and another entered and exited his left fourth finger, which was wrapped around his flashlight. (No witness testified to seeing a flashlight in the trooper's hand, only a gun). The fatal bullet struck his upper left arm, then entered his chest, passed through his lung, his heart and the other lung, and exited through the right side of his chest, getting trapped between his skin and his clothing. Three other bullets had been fired in a cluster into the trooper's back, at his right shoulder. They were fired, according to the pathologist, at the same 30-degree downward angle while the "target" was "prone" and "stationary." The bullets were fired from a nine millimeter Browning high power semi-automatic pistol.
The defendant's medical witness, Dr. Robert Wolf, testified that by reviewing the autopsy reports, but not the body, he initially concluded that the three bullets in the trooper's back were fired when the shooter was seven-and-a-half to ten feet away from the trooper, and
was standing direct, [while] the deceased was lower down, crouching or with knees bent.... the right side of the deceased was pointing generally toward the shooter, but ... the body was ever so slightly rotated, so that the bullet as it passed through the substance of the body of the deceased did not pass perfectly tangentially, but passed with a downward or inward, inward deflection of about an inch.
On cross examination, however, Dr. Wolf testified inconsistently with these quoted conclusions. When he drew the body as he thought it was positioned during the firing of the three bullets, he "designated the body to be face-down on the ground in the horizontal position." When asked by the prosecutor if "the body would be in the same position vis-a-vis the floor as that pen lying flat [on a table in the courtroom]" the doctor answered "Yes."
*155 On November 23, 1983 Manning and Williams were jointly indicted for murder, felony murder, and the felonies of escape and robbery. Manning was captured in Virginia on April 24, 1985, living with his wife and three children under the alias "Charles Boone." United States v. Levasseur, 620 F. Supp. 624, 627 (E.D.N.Y. 1985). Manning was not arraigned on the New Jersey charges until five months after his capture. He then stood trial for, and was convicted of, unrelated charges in New York. Levasseur, 620 F. Supp. at 632.

I
In his first point defendant argues that New Jersey denied him funds for expert services merely because he was represented by counsel of choice, not the Office of the Public Defender. He states that "[a]n indigent with pro bono counsel has the same right to expert services as an indigent represented by the public defender." Defendant further argues that because of this "right to expert services," the holding in In re State v. Stockling, 160 N.J. Super. 486 (App.Div. 1978), is unconstitutional. Stockling held that "an indigent defendant who chooses not to be represented by the Public Defender is not entitled to the service of expert witnesses or other incidents of his defense at the expense of either the county or the State." Stockling, at 490.
The State argues that defendant's request for free expert services has a fatal defect in that he has never been adjudicated indigent under New Jersey law. Citing N.J.S.A. 2A:158A-1 et seq. (the Public Defender Act), the prosecution argues that only indigents may receive State-funded services of any kind, legal or expert. Defendant asserts that the prosecutor and court apparently had accepted the fact of his indigency, because it was not placed in issue. Furthermore, he had been declared indigent in his previous federal trial, and that, he claims, meets the New Jersey statute's requirement.
Assuming, arguendo, that the defendant had been determined by New Jersey to be indigent, the State also maintains that he was still not eligible for free expert services because he refused legal assistance from the Office of the Public Defender. *156 The State argues that it was the Legislature's intent to provide expert services only for those represented by that office.
The defendant admits that he refused legal assistance from the Public Defender's office. Due to his ardent political beliefs and the "close relationship" that had developed between him and his attorney, Manning told the trial court that he would not accept another attorney. If denied Kunstler's services, he would then withdraw completely from his own trial; he would not represent himself, and he would not assist anyone else in his own defense. He refused to accept such help even after the trial court advised him that by remaining with his current attorney he was forfeiting free expert services. He reiterates, however, that the requirement that he have legal representation by the Public Defender's office before he is eligible to receive expert services is unconstitutional.
In denying the defendant's motion for free expert services, the trial judge based his denial not on whether defendant was indigent, but on the fact that "there was no authority to provide any State funds to indigent defendants who elect to be represented by counsel of choice other than those provided by the Office of the Public Defender...." This ruling was warranted by State v. Stockling, 160 N.J. Super. at 490. However, we here reject that conclusion.
The facts of Stockling are similar to those in the case at bar: both defendants were charged with first degree murder, and both were represented by private counsel. State v. Stockling, 153 N.J. Super. 362, 363, n. 2 (Law Div. 1977). The one significant difference between the two, however, is that in Stockling it was stipulated that the defendant was indigent; here, the subject might have been in question, had the issue not been rendered moot by the court's interpretation of Stockling. Yet the trial judge did not base his ruling upon this difference. Another difference, but also not a significant one, is that in Stockling the defendant's counsel was paid by his parents. Stockling, supra, 153 N.J. Super. at 363. In the case at bar the attorneys were serving pro bono publico. Apparently, in neither case was the defendant able to defray the cost of either counsel or necessary expert services.
*157 While we agree with defendant that an indigent defendant has a right to expert services, we need not reach his constitutional argument.[2] In reviewing Stockling and the Public Defender Act, we believe that the authority to provide State funds to indigent defendants represented by private counsel exists in the statute itself. The current version of N.J.S.A. 2A:158A-14 states that
[e]ligibility for the services of the Office of the Public Defender shall be determined on the basis of the need of the defendant. Need shall be measured according to:
a. The financial ability of the defendant to engage and compensate competent private counsel; [and]

*158 * * *
h. The ability of the defendant to provide all other necessary expenses of representation.[3] [Emphasis added].
We read this statute to mean that eligibility for public defender services must include whether the defendant can afford not only legal counsel, but also other services necessary for his defense, and we include in that description the services of experts, where necessary. N.J.S.A. 2A:158A-5 expressly provides (before and after the 1987 amendments):
It shall be the duty of the Public Defender to provide for the legal representation of any indigent defendant who is formally charged with the commission of an indictable offense.

All necessary services and facilities of representation (including investigation and other preparation) shall be provided in every case. [Emphasis added].
The 1987 amendments merely made explicit that the Public Defender could weigh the financial constraints of that office and the value of requested services on a case-by-case basis. What determines necessity will be discussed infra.
Recognizing the ever-increasing burden on the Public Defender's Office, we believe the Stockling court interpreted the Act in too restrictive a manner. In Stockling we stated that we could not "perceive any good reason why the State should be *159 required to provide for the payment of services other than legal representation when an indigent defendant chooses not to be represented by the Public Defender." Stockling, 160 N.J. Super. at 489. We now can perceive at least two good reasons. The Act itself requires that an indigent defendant receive "[a]ll necessary services and facilities of representation (including investigation and other preparation)...." It nowhere conditions those services on the defendant first receiving legal services from the Public Defender. N.J.S.A. 2A:158A-5 and N.J.S.A. 2A:158A-1 et seq.
Secondly, the increasingly overcrowded docket and insufficient resources, both monetary and personnel, of the Office of the Public Defender limit the number of cases that office can handle effectively. See 122 N.J.L.J. 1461 (Dec. 8, 1988). Permitting the cost of legal services to be borne by a charitable attorney or a third party would relieve the State of the legal costs and use of personnel involved in such defenses. In the usual situation, if an indigent defendant requires expert services beyond his means, he must refuse an offer of pro bono or third-party-funded legal services merely to avail himself of the State-financed experts. The State would then be required to pay for both legal and expert services, when it could have saved the cost, in both money and personnel, of the legal services.[4]
In State v. R.G.D., 108 N.J. 1 (1987), the New Jersey Supreme Court distinguished the general right to expert services established in Ake v. Oklahoma, supra, from the right to expert services in a juvenile waiver hearing. In R.G.D. the juvenile had been denied a psychiatric expert in a waiver hearing on the basis that he had private counsel "and consequently was not entitled to any services available through the Public Defender's office." 108 N.J. at 18. The Court noted that the United States Supreme Court in Ake v. Oklahoma, supra, had "held that an indigent defendant has a constitutional right to a psychiatrist when sanity is a significant factor at trial ... in proceedings where `an individual's life or liberty *160 [was] at risk.'" Ibid. (quoting Ake, 470 U.S. at 78, 105 S.Ct. at 1094, 84 L.Ed.2d at 63). The Court concluded, however, that the New Jersey waiver proceeding was not one where life or liberty was at risk, and therefore no expert service need have been provided to the juvenile. Since Manning's liberty was at risk here, the same is not true in our case. Manning should not have been denied State-funded expert services because he was represented by private counsel, whether that counsel was pro bono or paid by a third party.
There are, however, at least three other recognized reasons to deny a defendant payment for expert services, and we find that such a denial was appropriate in this case for three of these four reasons. Thus the denial of such payment or services for the reasons stated by the trial judge was harmless error. (We reiterate that he was properly bound by Stockling, and had no other choice).
As alluded to earlier, the first prerequisite to receiving State-funded services, whether legal or expert, is indigency. N.J.S.A. 2A:158A-1 states unequivocally that "[i]t is ... the policy of this State to provide for constitutional guarantees of counsel in criminal cases for indigent defendants...." [Emphasis added]. There is no case which holds that New Jersey is required to provide free expert services to a defendant who has not been adjudicated indigent.
The defendant bears the burden of proving his indigency, but in this case Manning did not do so, not because he could not, but because it was unnecessary. The trial court clearly ruled that simply because defendant was represented by private counsel, Stockling foreclosed such State-funded expert services. Had the trial court known of our decision today allowing both private counsel and State-funded experts for an indigent, the defense could have filed the requisite application for a declaration of indigency.[5]
*161 As Manning was foreclosed from proving his indigency, we do not affirm the trial court's denial of expert services because he failed to prove his indigency. Rather, we affirm the denial because the court could and should have denied Manning expert services for two other recognized reasons: (1) there was no reasonable basis upon which to refute the State's experts, (2) the defendant did in fact call competent expert witnesses of his own. These factors are interrelated and persuade us that the decision to deny defendant State-funded expert witnesses was correct.
Before the State will finance an indigent defendant's expert services, the facts of the case must "warrant" the need for expert testimony. State v. Green, 55 N.J. 13 (1969) (in a forgery case, where a pivotal question was whether the defendant signed the check, a supplemental handwriting expert was unnecessary), and State v. Williams, 46 N.J. 427 (1966) (court authorized the use of a toxicologist in the defense of a charge of entering with intent to steal).
On this appeal the defendant argues that he needed ballistics and trace evidence experts.[6] Given that the defendant maintained throughout the trial that he had in fact shot the trooper, case law asserts that the expert testimony on ballistics would have been meaningless and the denial of funds for such testimony was not error. Whether Manning or Williams shot the trooper, Manning would be equally culpable in the charges for which he was convicted. Cessor v. State, 282 Ark. 330, 668 S.W.2d 525, 528 (1984), and State v. Evans, 710 S.W.2d 530, 534 (Tenn. Crim. App. 1985) (defendants did not deny that they shot and killed the victims, so there was no error in withholding state funds for defendant's ballistics expert); United States v. Walborn, 730 F.2d 192, 194 (5th Cir.1984), cert. den. 469 U.S. *162 842, 105 S.Ct. 147, 83 L.Ed.2d 86 (1984) (where defendant admitted touching documents, no fingerprint expert was needed).
Additionally, the defendant did call four of his own expert witnesses. All but defendant's medical witness have little relevance to this appeal.[7] Defendant's chief expert witness was Dr. Robert Wolf, whose testimony was noted earlier. At oral argument defendant maintained that had he been able to pay for additional experts, those experts would have bolstered defendant's testimony and refuted that of the State's witnesses. We see no foundation for such an assertion, and in any event a defendant is not entitled to State funding for the leading experts in a field, only for competent experts. Cf. State v. Rinaldi, 58 N.J. Super. 209, 214 (App.Div. 1959), cert. den. 366 U.S. 914, 81 S.Ct. 1089, 6 L.Ed.2d 238 (1961), cert. den. 371 U.S. 847, 83 S.Ct. 82, 9 L.Ed.2d 83 (1962); State v. McCombs, 171 N.J. Super. 161, 165 (App.Div. 1979), aff'd o.b. 81 N.J. 373, 374 (1979).
Dr. Wolf testified that he had performed or assisted in more than 200 autopsies. Yet although he initially stated on direct that the trooper was probably in a crouched position when he was hit with the three bullets to his back (thus substantiating defendant's version of the incident), the witness directly contradicted himself on cross-examination and acknowledged that the trooper was lying prone when the bullets entered his body. We cannot surmise that a different expert would be able to refute that testimony. The pathologist who conducted the autopsy stated that the trooper had been in a "prone" position. An impartial eyewitness saw the driver of the Nova shoot the trooper in the back. Furthermore, had the victim been other than prone, each shot would have moved his body somewhat, *163 and each bullet's path would thus have been at a different angle; yet the physical evidence demonstrated parallel paths to the cluster of bullets in the trooper's back.
Any reasonable balancing of the defendant's right to call witnesses and the State's right not to waste its resources would have resulted in the denial of any additional State-funded expert on this issue.[8] The entire record in this case indicates that defense counsel, especially defendant's primary attorney, Kunstler, pursued a vigorous and knowledgeable cross-examination of the State's witnesses. There was no showing that the facts were subject to contrary interpretation by any available expert, whether within or beyond defendant's means.
To summarize, we find that it was not necessary for defendant to have been afforded legal representation by the Public Defender's Office in order to receive expert services from the State. The right established by the Legislature depends upon the defendant's indigent status, not whether the Public Defender is the counsel of record. However, on the facts of this case, it was proper for the trial court to have denied defendant's request for funds for expert services, because it is unlikely, given the physical evidence and the eyewitness' testimony, that additional witnesses for the defendant would have been able to refute the State's evidence. Furthermore, the defendant effectively cross-examined the State's expert witnesses, and called adequate expert witnesses of his own.

II
[After a factual analysis, the court determined that defendant's second point was unavailing. There was no inherently inconsistent verdict; and any reference in the indictment to the codefendant having fired the fatal shot was surplusage].

*164 III
[The court factually determined that defendant's third point was unavailing. There was no basis for a claim of a discriminatory use of the State's peremptory challenges].

IV
In its cross-appeal, the State contends that the judge mistakenly merged defendant's conviction for escape, and thus the matter should be remanded for resentencing. The State's cross-appeal has merit. Defendant was convicted of two counts of felony murder, one based on the escape, and the other on the robbery of the gun. As there was only one death, there could be only one conviction for felony murder. Yet the other underlying felony conviction, absent its accompanying murder charge, need not be disregarded for sentencing purposes. While there might have been a dispute concerning whether the robbery or escape would be the charge to be encompassed within the surviving felony murder conviction, the State is willing to accept the lesser of the two additional convictions, escape, as the surviving conviction. We therefore remand for resentencing for the escape conviction. The trial court should also determine whether the additional separate sentence should be made concurrent or consecutive, pursuant to the guidelines of State v. Yarbough, 100 N.J. 627, 643-644 (1985), cert. den. 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).
As the State acknowledges in its brief, and the defendant in his reply brief understandably agrees, the defendant's period of parole ineligibility on the felony murder conviction should be reduced from 30 years, as ordered by the trial judge, to 25 years, the maximum allowable at the time of the crime. It was not until 1982 that the Legislature amended N.J.S.A. 2C:11-3b to require 30 years without parole. L. 1982, c. 111. See also State v. Rodriguez, 97 N.J. 263, 274, n. 4 (1984).
We therefore remand this case so the trial court can impose a sentence for the additional escape conviction, and also resentence Manning to a maximum of 25 years parole ineligibility for the felony murder conviction.
*165 ANTELL, P.J.A.D., concurring.
I join with the majority's determination to affirm the judgment of conviction under review. I write, however, to express my disagreement with its conclusion that the Public Defender Act, N.J.S.A. 2A:158A-5, entitled defendant to the cost of expert witnesses where he refused to accept legal representation by the Public Defender. Although I endorse the logic of the majority's view that such services should be financed by the State for indigent defendants who are privately represented, this is a policy decision which the Legislature has not made and which lies beyond our competence.
The only statutory authority for the allowance of expert services to indigent defendants is contained in N.J.S.A. 2A:158A-5, which specifies that these must be provided by the Public Defender as part of that office's "legal representation of any indigent defendant who is formally charged with the commission of an indictable offense." The fact that there may be, as the majority perceives, "good reasons" to provide for the payment of services to privately represented indigent defendants cannot operate to enlarge the plain meaning of the statute.
The majority distinguishes our decision in In re State v. Stockling, 160 N.J. Super. 486 (App.Div. 1978), in part upon the ground that we there failed to "perceive any good reason why the State should be required to provide for the payment of services other than legal representation when an indigent defendant chooses not to be represented by the Public Defender," id. at 489, whereas here we do perceive such good reason. But the phrase "good reason" was not intended in Stockling to refer to the absence of any good policy reason. What was alluded to was the absence of any sound statutory basis on which to grant the application. This is clear from the language immediately following that quoted above in which we noted, as a "sole exception," the statutory authority to provide a free transcript.
To the extent that Stockling speaks to the issue here addressed, I adhere to the conclusion therein reached.
Notwithstanding the view hereinabove stated, I nevertheless agree that the mere fact of defendant's representation by *166 private counsel did not preclude his eligibility to receive the financial assistance necessary to pay the cost of expert witnesses. In my judgment, the State was obliged to furnish such assistance on constitutional grounds. See Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); State v. R.G.D., 108 N.J. 1, 18 (1987); State v. Green, 55 N.J. 13, 18 (1969). This view is in no respect inconsistent with Stockling, which gave no consideration to constitutional implications. However, I agree with the majority that a factual analysis of the evidence leaves no doubt that additional expert testimony could not have altered the outcome of the trial and that the trial court's refusal to provide the requested assistance was harmless. In all other respects I also concur with the opinion of the majority.
NOTES
[1] The first witness, Hamilton, did not testify about the number of people at the scene.
[2] New Jersey's Public Defender Act satisfies the Gideon v. Wainwright, 372 U.S. 335, 343-344, 83 S.Ct. 792, 795-796, 9 L.Ed.2d 799, 804 (1963), right to counsel required by the United States Constitution (states are obligated to provide counsel to "any person haled into court, who is too poor to hire a lawyer"), Stockling, supra, 160 N.J. Super. at 489. Gideon does not require a state to provide a lawyer for someone who is not too poor to hire a lawyer, nor does it instruct the states on how to provide such counsel. As recently as 1985 the Supreme Court confirmed that the way in which states provide legal counsel for the poor is left to the states. Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53, 66 (1985).

New Jersey provided legal counsel for indigents even before the United States Supreme Court required it. State v. Horton, 34 N.J. 518 (1961). Until 1967 we used the assigned counsel system, in which a particular judge would designate a member of the local bar to represent the defendant. Horton at 524. But there were criticisms of this system, primarily because it did not provide timely and thorough representation (Horton, supra, at 526, n. 4), and because the cost of defending indigents fell on the "members of the bar." State v. Rush, 46 N.J. 399, 415 (1966). After the Gideon decision, and after considering that the then-current New Jersey system needed to be reviewed, the State Supreme Court wrote that "[t]he Legislature should have an opportunity to decide whether this obligation of the State should be met by the present system of assignment in individual cases, or by a public defender, or some combination of both." Rush, at 415. In 1967, by the adoption of the Public Defender Act, the Legislature decided that the public defender system best met this problem. N.J.S.A. 2A:158 et seq.
Judge Antell in his concurring opinion persuasively argues that the result we reach is also supported on constitutional grounds. We fully subscribe to his analysis on this point. But we are enjoined not to reach a constitutional issue when a matter can be otherwise determined. Donadio v. Cunningham, 58 N.J. 309, 325-326 (1971); State v. Salerno, 27 N.J. 289, 296 (1958), Grant v. Wright, 222 N.J. Super. 191, 197-198 (App.Div. 1988), certif. den. 111 N.J. 562 (1988). We have therefore chosen to rely upon our construction of the statute, even appreciating the difference of opinion between our concurring colleague on this point of statutory construction.
[3] The statute was revised in 1987, but the revisions do not change the meaning of the portions of the statute relevant to this case. N.J.S.A. 2A:158A-2, L. 1987, c. 170 § 1. According to the Senate Judiciary Committee Statement accompanying the revised Bill, the earlier act, in effect at the time of the Manning proceedings, was based upon a defendant's need. Further:

The appointment of counsel to an indigent defendant is made in consideration of `the financial ability of the defendant to engage and compensate competent private counsel and to provide all other necessary expenses of representation.' The bill retains this basic concept but also details other factors which are to be investigated in ascertaining the financial status of the defendant....
The bill has language indicating that it is within the authority of the Public Defender to weigh the factors of need and real value to a defense against the financial constraints of the Public Defender's Office in determining what are the necessary services and facilities of representation. [Emphasis added].
[4] In the not-unusual situation where a defendant's family could scrape together funds for an attorney's fee, but not for the cost of experts, the State is now saddled with the total cost of defense. We do not see in the wording of the Public Defender Act that the Legislature intended such a result.
[5] We note that according to the Public Defender Act, indigency is determined by an "investigation of the [defendant's] financial status" by the Office of the Public Defender. N.J.S.A. 2A:158A-15. The investigation is only made, however, upon application to the Office of the Public Defender for legal representation, and although the defendant filled out such an application, there is no indication that he filed it or that it was processed by the Public Defender's Office.
[6] It is notable that while during the trial the defendant asserted he needed experts on jury polling, as well as on blood, glass, and fingerprint analysis, he is not pursuing those claims on appeal.
[7] One FBI Agent, William Albrecht, was a hostile witness. Albrecht had been cross-examined by Manning's attorney just prior to the end of the State's case. His specialty was firearm and toolmark identification, and he testified "as an examiner" of shell casings. Det. Fred Tavener, a New Jersey State Trooper, testified to a search and seizure issue regarding the defendant's driver's license. He put into question the credibility of one of the State's previous witnesses. The defendant also called Michael Flora, an expert in bloodhound tracking who testified that his dog found a trail from the abandoned Nova that was "inconclusive."
[8] We note that if defendant's application for legal representation by the Public Defender's Office had been made properly, it would have been within the discretion of the Public Defender's Office to review the request and, on the basis of individual need, determine whether the services should be provided and how much should be expended. N.J.S.A. 2A:158A-14 vests this discretion in the Public Defender, and does not require that the State write a blank check for privately-represented defendants.