868 A.2d 290

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. DAMON L. HILL, DEFENDANT–RESPONDENT.

Argued November 30, 2004—Decided March 9, 2005.

*Maura K. Tully,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Robert L. Sloan,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal requires that we address a conflict in decisions from the Appellate Division and presents a discrete yet repeatedly vexing question: what, if any, predicate crimes must merge with a felony murder conviction for sentencing purposes when more than one predicate crime has been proven.

We hold that there is a "compelling need for the use of special verdict[ ] [forms]," *State v. Diaz,* 144 *N.J.* 628, 644, 677 *A.*2d 1120, 1127 (1996), under *Rule* 3:19–1(b) for the jury to designate which felony or felonies constitute the predicate crime for a felony murder conviction. If the jury designates more than one felony as the predicate for felony murder, the trial court at sentencing is to merge only the predicate felony that set in motion the chain of

events leading to the murder—the "first-in-time" predicate felony—into the felony murder conviction.

## I.

Although the factual background of this case does not greatly inform the outcome, it does provide some necessary context.

Until the mid–1980's, when she was in her mid-seventies, Anne King operated her three-story Asbury Park home as a rooming house named "King Manor." Acknowledging the decline in her neighborhood, King stopped renting rooms and engaged in a series of efforts to enhance the safety of her home: she had extra locks installed on her front door, she had her windows and back door nailed shut, she kept the rooms in her home padlocked, and she had her fire escape greased. Believing herself protected and inaccessible, King left the outside window and the interior door to one third-floor bedroom open and unlocked. The ledge of the unlocked window was approximately two feet from the window on the third-floor of the house next door.

In February 1996, the Taylor family lived on the second- and third-floors of the house next door. Their fourteen-year-old daughter, Mika, occupied the bedroom directly across from King's unlocked window. Mika's boyfriend and the father of her unborn child was defendant Damon L. Hill, who was then seventeen-years-old. As a practical matter, defendant lived with Mika in her bedroom, from which all others were excluded as Mika and defendant purchased a separate lock for that bedroom, defendant had installed it, only Mika and defendant had keys to that lock, and Mika kept the bedroom door locked whenever she was not occupying the room.

Defendant soon discovered that King was a creature of habit. Among other things, she would leave King Manor every Wednesday to play bingo with her friends. Coupling this knowledge with his observation that the window to King's third-floor bedroom was only two feet away from Mika's bedroom window, defendant found

a ready source of income by burglarizing King Manor during King's absences.

On Wednesday, February 28, 1996, King, by now eighty-four-years-old, was picked up by her friend Diana Costanzo for an afternoon and evening of shopping, dinner and bingo. Costanzo returned King home at approximately 10:45 p.m. It was the last time Costanzo would see her friend alive.

The next day, Thursday, February 29, 1996, defendant broke into King Manor yet again, only this time King was home. She met up with defendant as she was returning to the living room from the kitchen with a light snack. King tried to return to the kitchen, but defendant struck her on the head with a hammer, sending the food tray she was holding careening down the hallway. King tried to protect herself; however, defendant continued to strike her repeatedly with the hammer, causing severe and multiple injuries leading to King's death from these blows.

Defendant dragged King's body down the hallway to the front of the house, a passage marked by a bloody trail on the carpet. Defendant left, returning to Mika's bedroom through the third-floor window.

On returning to Mika's bedroom, defendant spoke with Mika's brother, Nicholas Taylor. According to Nicholas, defendant was standing in front of the open window, still holding the hammer he had used to brutally murder King, when he said: "I killed her. It just happened." Nicholas did not believe defendant and claimed he wanted to see for himself. At defendant's direction, Nicholas retraced defendant's entry into King Manor, went downstairs, saw King's body and returned the way he entered. By the time he re-entered Mika's bedroom through the window, defendant had changed his clothes and had left. Nicholas never saw the hammer again.

For the next two days, King's friends tried to reach her, but to no avail. Finally, they called the Asbury Park Police. On Saturday, March 2, 1996, two officers of the Asbury Park Police

Department arrived at King Manor to check on King and found the mail for that day and the day before still in the mailbox. When no one answered the door, the officers tried to enter, only to find that the front door and one of the porch windows was locked and another of the porch windows was nailed to keep it from opening more than four inches. The officers forced that window open and went inside. They soon discovered King's body.

The officers searched the house and found that the back door and windows were locked, nailed shut and wedged shut, and that, save for the open door and window in the third-floor bedroom across from Mika's bedroom, all the bedroom doors and windows were locked or nailed shut. When the officers looked out that window towards Mika's bedroom, they saw three coins on an eave of the Taylor home.

On Monday, March 4, 1996, Detective Frank Cavalieri of the Major Crimes Unit in the Monmouth County Prosecutor's Office went to the Taylor home where he met defendant. Detective Cavalieri was allowed access to Mika's bedroom to determine whether one could see into King Manor from that vantage point. Later in the day, the detective received information that defendant was wanted on an unrelated outstanding juvenile warrant, and arrested defendant. At police headquarters, defendant's mother allowed the detective to interview defendant. After waiving his *Miranda* rights, *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), defendant initially admitted that he had spent the evening of February 29, 1996 at the Taylor home and that he had heard King had "bumped her head" and died. When Detective Cavalieri asked defendant if he had entered King Manor, defendant withdrew, started looking away and down at the floor and refused to answer any of the detective's questions. The detective ultimately terminated the interview.

Defendant was taken to the Youth Detention Center, where he confessed to three of his fellow inmates, on three separate occasions, that he had broken into King's home looking for money, had

robbed her of "a couple of dollars," and then had killed her with a hammer.

Because defendant was still a juvenile but was "14 years of age or older at the time of the charged delinquent acts," *N.J.S.A.* 2A:4A–26(a)(1), on September 1, 1998, the State moved to try defendant as an adult for the murder of King. That motion was granted on October 8, 1998. In May 2000, defendant was indicted for purposeful or knowing murder (count one), felony murder (count two), aggravated manslaughter (count three), manslaughter (count four), first-degree armed robbery (count five), second-degree burglary (count six), two counts of third-degree burglary (counts seven and eleven), two counts of fourth-degree criminal trespass (counts eight and twelve), third-degree possession of a weapon for an unlawful purpose (count nine), and fourth-degree unlawful possession of a weapon (count ten). Counts one through ten relate to the events of February 29, 1996 leading up to and including Mrs. King's murder; counts eleven and twelve relate to defendant's earlier burglaries of King Manor.

Defendant's first trial was held in March 2001. The jury acquitted defendant of the knowing and purposeful murder charge (count one), but was unable to reach a verdict on the remaining charges. In October 2001, defendant was retried. This time the jury convicted defendant of all eleven remaining charges. At sentencing on January 11, 2002, the sentencing court merged defendant's third-degree burglary (count seven) and fourth-degree trespass (count eight) convictions into defendant's conviction for first-degree armed robbery (count five); defendant's fourth-degree unlawful possession of a weapon (count ten) into his conviction for third-degree possession of a weapon for an unlawful purpose (count nine); and defendant's fourth-degree criminal trespass (count twelve) conviction into his conviction for third-degree burglary (count eleven). As a result, for sentencing purposes, defendant was sentenced to thirty years imprisonment with a thirty-year period of parole ineligibility for felony murder, fifteen years imprisonment for first-degree armed robbery, seven years

imprisonment for second-degree burglary, four years imprisonment for third-degree possession of a weapon for an unlawful purpose, and four years imprisonment for third-degree burglary, all of the sentences to run concurrently.

Defendant appealed and the Appellate Division affirmed defendant's felony murder conviction, but vacated defendant's convictions for third-degree possession of a weapon for an unlawful purpose, second-degree burglary, and first-degree robbery and remanded the case for modification of defendant's sentence. *State v. Hill,* 365 *N.J.Super.* 463, 839 *A.*2d 908 (App.Div.2004). Relying on *State v. Pantusco,* 330 *N.J.Super.* 424, 750 *A.*2d 107 (App.Div.), *certif. denied,* 165 *N.J.* 527, 760 *A.*2d 781 (2000), and *State v. Lado,* 275 *N.J.Super.* 140, 645 *A.*2d 1197 (App.Div.), *certif. denied,* 138 *N.J.* 271, 649 *A.*2d 1290 (1994), the Appellate Division held that, in the absence of a special verdict indicating which predicate offenses the jury found as a condition precedent to a conviction for felony murder, all of the predicate offenses of which defendant was convicted merged into the felony murder conviction. *State v. Hill, supra,* 365 *N.J.Super.* at 472, 839 *A.*2d at 913–14. The Appellate Division "encourage[d] trial courts in the future to use special verdicts to avoid the dilemma presented in this case." *Ibid.,* 839 *A.*2d at 913 We denied defendant's petition for certification but, due to the Appellate Division's clear acknowledgement that its decision "is in conflict with ... other decision[s] of the same or higher court," *R.* 2:12–4, we granted the State's petition for certification. 179 *N.J.* 373, 845 *A.*2d 1255 (2004). For the reasons that follow, we reverse the judgment of the Appellate Division and remand the matter to the trial court for resentencing in accordance with this opinion.

## II.

In this State, the statutorily defined term of "[c]riminal homicide" is defined as the purposeful, knowing or reckless murder, manslaughter or death by auto of another human being. *N.J.S.A.*

2C:11–2. Among New Jersey's statutory categories of murder, the common law crime of felony murder is codified as follows:

(a) Except as provided [for manslaughter], criminal homicide constitutes murder when:

. . . .

(3) It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping, carjacking, criminal escape or terrorism . . ., and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants[.]

[*N.J.S.A.* 2C:11–3(a)(3).]

The rationale for the felony murder rule has been succinctly stated:

[T]he continuing justification for the felony-murder rule is that in some circumstances one who commits a felony should be liable for a resulting, albeit unintended, death. . . .

The historical justification for the rule is that it serves as a general deterrent against the commission of violent crimes. The rationale is that if potential felons realize that they will be culpable as murderers for a death that occurs during the commission of a felony, they will be less likely to commit the felony. From this perspective, the imposition of strict liability without regard to the intent to kill serves to deter the commission of serious crimes.

[*State v. Martin,* 119 *N.J.* 2, 20, 573 *A.*2d 1359, 1368 (1990) (citations omitted).]

This explanation, however, does not fully address the merger considerations present when a defendant has been convicted of both felony murder and more than one predicate offense. By definition, a conviction for felony murder must have as its predicate the commission or attempted commission of either "robbery, sexual assault, arson, burglary, kidnapping, carjacking, criminal escape or terrorism . . . ." *N.J.S.A.* 2C:11–3(a)(3). Inasmuch as the crime of felony murder requires a predicate crime, when more than one predicate felony is found by the jury the question becomes whether, and to what extent, one or more of such predicate crimes merges into the felony murder conviction for sentencing purposes. Stated differently, the question confronted by a sentencing court in these circumstances is whether all or only one of those predicate crime convictions must merge into the felony murder conviction. We, therefore, must harmonize the

felony murder rule—a crime that requires as its predicate the commission of yet another enumerated crime—with the legal principles applicable to merger.

## III.

 Generally, *State v. Brown* sets forth this Court's "approach" to merger issues:

> We follow a "flexible approach" in merger issues that "requires us to focus on the 'elements of the crimes and the Legislature's intent in creating them,' and on 'the specific facts of each case.'" The overall principle guiding merger analysis is that a defendant who has committed one offense "'cannot be punished as if for two.'" Convictions for lesser-included offenses, offenses that are a *necessary* component of the commission of another offense, or offenses that merely offer an alternative basis for punishing the same criminal conduct will merge.
>
> [*State v. Brown*, 138 *N.J.* 481, 561, 651 *A.2d* 19, 58 (1994), *overruled on other grounds, State v. Cooper*, 151 *N.J.* 326, 700 *A.2d* 306 (1997) (citations omitted).]

*See also State v. Cole*, 120 *N.J.* 321, 325–30, 576 *A.2d* 864, 866–69 (1990) (acknowledging that "merger implicates a defendant's substantive constitutional rights" and reaffirming the adoption of a "flexible approach in resolving merger issues"); *State v. Rodriguez*, 97 *N.J.* 263, 271, 478 *A.2d* 408, 412 (1984) ("The application of merger can have significant penal consequences.... Not only does merger have sentencing ramifications, it also has a measurable impact on the criminal stigma that attaches to a convicted felon.") In following that approach, we look to *N.J.S.A.* 2C:1–8a, as it

> establishes the legislative parameters for merger of offenses. The Legislature "defines the unit of prosecution or 'offense' and ordains the punishment." In the sentencing context, the federal "constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." Similarly, merger issues implicate a defendant's substantive state constitutional rights that are rooted in principles of double jeopardy, due process, or some other legal tenet. The purpose of merger is to avoid double punishment for a single wrongdoing.
>
> The standard for merger of offenses set forth in *N.J.S.A.* 2C:1–8, providing that offenses are different when each requires proof of facts not required to establish the other, has been characterized as "mechanical." A preferred and more flexible standard was articulated in the pre-code case of *State v. Davis* [where] the Court observed:

Such an approach would entail analysis of the evidence in terms of, among other things, the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed.

[*State v. Diaz,* 144 *N.J.* 628, 637–38, 677 *A.*2d 1120, 1124 (1996) (citations omitted).]

The "preferred and more flexible standard ... articulated in ... *State v. Davis* [,68 *N.J.* 69, 81, 342 *A.*2d 841, 847 (1975)]," must be tempered by the injunction that, particularly in its application to felony murder, "when there is sufficient evidence to support two or more alternative felony theories, a jury need not designate which felony theory it relies on to convict one of felony murder so long as there is sufficient evidence to sustain each felony" and "jurors need not always be unanimous on the theory of guilt, provided they are unanimous in the finding of guilt of the offense charged." *State v. Harris,* 141 *N.J.* 525, 562, 662 *A.*2d 333, 352 (1995) (citations omitted; emphasis supplied). Guidance also arises from the principle that "the Legislature may fractionalize a single criminal episode into separate offenses when the Legislature intends them to be punished separately and when the fractionalization does not offend constitutional principles." *State v. Mirault,* 92 *N.J.* 492, 504, 457 *A.*2d 455, 462 (1983). Indeed, merger analyses directly impact sentencing determinations and, therefore, we also must be mindful of the overarching consideration that "there can be no free crimes in a system for which the punishment shall fit the crime...." *State v. Yarbough,* 100 *N.J.* 627, 643, 498 *A.*2d 1239, 1247 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986).

Because the crime of felony murder, by definition, subsumes in its grasp a committed predicate crime, when, as here, more than one predicate crime is found by the jury, we must grapple with which of those predicate crimes merges into a conviction for felony murder.

We are not alone in that quandary as other states similarly have wrestled with this question, often to further confusing results. At

the outset, there are two lines of analysis worth noting. The first, to which a number of states adhere, simply holds that an underlying predicate felony constitutes a separate offense and, hence, never merges into the felony murder conviction. *State v. Bisner,* 37 *P.*3d 1073, 1092 (Utah 2002); *State v. Ramos,* 271 *Kan.* 520, 24 *P.*3d 95, 101–02 (2001); *Todd v. State,* 917 *P.*2d 674, 679 (Alaska), *cert. denied,* 519 *U.S.* 966, 117 *S.Ct.* 391, 136 *L.Ed.*2d 306 (1996); *Talancon v. State,* 102 *Nev.* 294, 721 *P.*2d 764, 768 (1986); *State v. Enmund,* 476 *So.*2d 165, 167–68 (Fla.1985); *State v. Blackburn,* 694 *S.W.*2d 934, 936–37 (Tenn.1985); *State v. Close,* 191 *Mont.* 229, 623 *P.*2d 940, 950–51 (1981); *People v. Berzups,* 49 *N.Y.*2d 417, 426 *N.Y.S.*2d 253, 402 *N.E.*2d 1155, 1160 (1980). The second addresses the problem before it arises by requiring that the prosecution charge each predicate offense as a separate charge of felony murder; if multiple convictions for the same death are returned by the jury, the court vacates any duplicative ones. *Waller v. United States,* 531 *A.*2d 994, 999 n. 9 (D.C.Ct.App.1987).

Two separate views—what can be called, for ease of reference, the "single predicate felony merger" view versus the "multiple predicate felony merger" view—can be discerned from a comparison of the case law of other states that engage in a merger analysis when more than one predicate crime also has been proven in a felony murder prosecution. The single predicate felony merger view holds that only one predicate crime merges into the felony murder conviction; the confusion arises in determining which predicate crime so merges when, as here, more than one predicate crime is proven. One school of thought in this view examines the predicate crimes on a sliding scale, with some courts merging into the felony murder conviction the predicate crime with the greatest penological implications for the defendant, while others merge into the felony conviction the predicate crime with the least penological implications for the defendant. *Compare State v. Dudley,* 151 *N.C.App.* 711, 566 *S.E.*2d 843, 847 (2002), *review denied,* 356 *N.C.* 684, 578 *S.E.*2d 314 (2003) (merging the predicate offense with the greatest penological implications) *and*

*Thompson v. State,* 263 *Ga.* 23, 426 *S.E.*2d 895, 897 (1993), *disapproved on other grounds, McClellan v. State,* 274 *Ga.* 819, 561 *S.E.*2d 82, 85 (2002) (merging the most serious predicate offense), *with Small v. State,* 458 *So.*2d 1136 (Fla.Dist.Ct.App. 1984) (merging the predicate offense with the least penological implications).[1] Another school of thought requires a form of "but-for" or causation analysis, requiring merger of "that felony which most directly contributes to the death of the victim. . . ." *Callis v. People,* 692 *P.*2d 1045, 1054 (Colo.1985). Yet another branch of this view applies a "first-in-time" analysis, seeking for merger purposes the felony that "was the initial felony which began the chain of events ultimately leading to the victim's death. . . ." *Munson v. Oklahoma,* 758 *P.*2d 324, 333 (Okla.Crim.App.1988), *cert. denied,* 488 *U.S.* 1019, 109 *S.Ct.* 820, 102 *L.Ed.*2d 809 (1989). In contrast, under the multiple predicate felony merger view, all potential predicate offenses merge into the felony conviction. *See Michigan v. Greve,* No. 234430, 2003 *WL* 178786, at *2 (Mich.Ct. App. Jan. 24, 2003); *Fisher v. State,* 367 *Md.* 218, 786 *A.*2d 706, 747 (2001) (Bloom, J., concurring in part and dissenting in part).

## IV.

Our own Appellate Division jurisprudence exemplifies the random confusion produced by these competing analyses and highlights the unevenness of our application of the merger doctrine. In *State v. Manning,* 234 *N.J.Super.* 147, 560 *A.*2d 693 (App.Div. 1989), a defendant convicted of escape, robbery and felony murder claimed that both the escape conviction and the robbery conviction must merge into the felony murder conviction. The trial court

---

[1] As noted earlier, in *State v. Enmund,* 476 *So.*2d 165, 167–68 (Fla.1985), the Supreme Court of Florida held that a predicate offense constitutes a separate offense and, hence, never merges into a felony murder conviction. Although *State v. Enmund, supra,* was decided a year after *Small v. State, supra,* it does not refer to *Small v. State.* We cannot reconcile this conflict in Florida law, save to look to *State v. Enmund, supra,* as a pronouncement of the Supreme Court of Florida and, hence, precedential over *Small v. State, supra,* an earlier decision of Florida's intermediate appellate court.

agreed and the State appealed, contending that the sentencing court mistakenly merged the defendant's escape conviction into the felony murder conviction. Adopting the State's reasoning, and tacitly approving the theory of merging into the felony murder conviction the predicate offense with the greatest penological consequence, the Appellate Division held that

> [d]efendant was convicted of two counts of felony murder, one based on the escape, and the other on the robbery of the gun. As there was only one death, there could be only one conviction for felony murder. Yet the other underlying felony conviction, absent its accompanying murder charge, need not be disregarded for sentencing purposes. While there might have been a dispute concerning whether the robbery or escape would be the charge to be encompassed within the surviving felony murder conviction, the State is willing to accept the lesser of the two additional convictions, escape, as the surviving conviction. We therefore remand for resentencing for the escape conviction.
>
> [*Id.* at 164, 560 A.2d at 701.]

Five years later, in *State v. Lado*, 275 *N.J.Super.* 140, 157, 645 A.2d 1197, 1205 (App.Div.1994), the Appellate Division noted that "[w]e can take judicial notice that no issue consumes more of our time than merger...." In *Lado*, the panel grappled with the "question of merger with respect to possession of a weapon for an unlawful purpose and a substantive offense committed with that weapon." *Ibid.* Seeking to establish some uniform approach, the Appellate Division announced this rule:

> [I]n the absence of a special verdict, authorized by *R.* 3:19–1(b), by which the jury finds that the unlawful purpose is broader than the substantive offense or offenses on which defendant is convicted, the possession of a weapon with an unlawful purpose conviction must merge into the substantive offense.
>
> [*Id.* at 158, 645 A.2d at 1207.]

The Appellate Division cautioned that it was not encouraging the use of "a special interrogatory prohibited by *State v. Simon*[, 79 *N.J.* 191, 398 A.2d 861] [because t]he jury cannot be asked to identify the unlawful purpose or for specific fact-finding, but [added that] a special verdict is acceptable." *Id.* at n. 10 (citation omitted).

The Appellate Division grappled with the merger doctrine within the framework of a felony murder conviction in *State v. Pantusco*, 330 *N.J.Super.* 424, 428–29, 750 A.2d 107, 109 (App.Div.

2000), where the defendant was convicted of felony murder, aggravated manslaughter, aggravated assault, robbery, burglary, and theft arising from defendant's theft of a car followed by a theft/robbery crime spree that ended in a police chase resulting in the death of an innocent motorist. The Appellate Division adopted the second view described earlier and merged all of the predicate offenses into the felony murder conviction because

> the jury was not asked by special verdict to indicate from which robbery or robberies defendant was fleeing when the accident occurred, and the judge instructed the jury that if the death occurred during the flight of any one robbery, defendant could be convicted of felony murder. As a result, the judge should have merged all the robbery convictions into the felony murder as the record reflects no finding as to which constituted the underlying felony, and the jury may have concluded that it was all three.
>
> [*Id.* at 444, 750 *A.2d* at 117 (citations omitted).]

*Pantusco* stands in stark contrast to *State v. Soto,* 340 *N.J.Super.* 47, 53–54, 773 *A.*2d 739, 742–43 (App.Div.), *certif. denied,* 170 *N.J.* 209, 785 *A.*2d 438 (2001), where a defendant was convicted of aggravated manslaughter, felony murder, robbery, conspiracy to commit robbery, kidnapping, burglary, possession of a handgun for an unlawful purpose, and possession of a crossbow for an unlawful purpose. On appeal, the defendant argued, among other things, that "the trial court erred in failing to merge the robbery and kidnapping convictions into the felony murder conviction, as he did with the burglary conviction, because there was no way to determine which of the three alternative predicate felonies the jury found to be the predicate felony." *Id.* at 69, 773 *A.*2d at 752. There the Appellate Division rejected the defendant's claim and adopted a form of the single predicate felony merger view, reasoning that

> the jury convicted defendant of all three predicate crimes—the robbery, the burglary, and the kidnapping—and defendant did not request a unanimity charge. Consequently, we find no error in the trial judge sentencing defendant separately for the two crimes for which he was convicted which were not designated the predicate felony.
>
> [*Id.* at 70–71, 773 *A.*2d at 753 (citation omitted).]

In this case, after outlining defendant's merger claims, the Appellate Division held:

There is no satisfactory answer to this merger question. We chose to follow *Pantusco,* and by analogy, *Lado.* Here, the jury could have found both offenses to have been the predicate to murder. It was free to do so. We have no rational basis to pick one crime over the other as the predicate. Accordingly, we merge both burglary and robbery into felony murder. We encourage trial courts in the future to use special verdicts to avoid the dilemma presented in this case. [*State v. Hill,* 365 *N.J.Super.* 463, 472, 839 *A.*2d 908, 913 (App.Div.2004) (citations omitted).]

## V.

### A.

 Our review of this jurisprudence leads us to conclude that, in the context of felony murder considerations, the best course is to simplify the merger determination. We therefore hold that there is a "compelling need for the use of special verdict[ ] [forms]," *State v. Diaz,* 144 *N.J.* 628, 644, 677 *A.*2d 1120, 1127 (1996), under *Rule* 3:19–1(b) for the jury to designate which felony or felonies constitute the predicate crime for a felony murder conviction. If the jury designates more than one felony as the predicate for felony murder, the trial court at sentencing is to merge only the predicate felony that set in motion the chain of events leading to the murder—the "first-in-time" predicate felony—into the felony murder conviction.

### B.

 The Appellate Division commended to the trial courts the "use [of] special verdicts to avoid the dilemma presented in this case." *State v. Hill, supra,* 365 *N.J.Super.* at 472, 839 *A.*2d at 913. We agree. We recognize that the standard in this State is that

the use of special interrogatories in criminal cases is discouraged because of "their potential for destroying the ability of the jury to deliberate upon the issue of guilt or innocence free of extraneous influences. That potential for harm inheres in the subtly coercive effect interrogatories can have upon the course of a jury's deliberations." The subtle coercive effect is manifested in requiring the jury to make specific findings of fact.

Most of the risks inherent in the use of special interrogatories are not present in special verdict sheets that have been properly prepared and submitted to the jury with appropriate instructions. Special verdict sheets that list only the charges and

lesser-included offenses under an indictment, and do not list the elements of the offenses, are unlikely to be confusing or have any coercive effect on the jury. When multiple offenses are submitted to a jury, special verdicts are often helpful to an orderly deliberative process. The use of special verdicts was approved in *State v. Petties*[, 139 *N.J.* 310, 654 *A.2d* 979]. Furthermore, *Rule* 3:19–1(b) permits trial courts, in their discretion, to submit special verdicts to juries "to facilitate the determination of the grade of the offense under the Code of Criminal Justice or otherwise simplify the determination of a verdict when multiple charges are submitted to the jury."

Consistent with *State v. Petties*, *State v. Simon*, and *Rule* 3:19–1(b), when there is a compelling need for the use of special verdicts, the trial court in its discretion should use them to avoid reversal of ambiguous verdicts.

[*State v. Diaz*, 144 *N.J.* 628, 643–44, 677 *A.2d* at 1127 (1996) (citations omitted).]

That said, the guiding principle here as applied to a merger analysis is clearly outlined in *Rule* 3:19–1(b): special interrogatories or special verdicts may be allowed when a written verdict sheet will "simplify the determination of a verdict when multiple charges are submitted to the jury." Because of the merger considerations that can and do arise as a result of a jury's determination that more than one predicate felony has been established in a felony murder prosecution, a "compelling need," *State v. Diaz, supra*, 144 *N.J.* at 644, 677 *A.2d* at 1127, is present sufficient to overcome the general principle that the use of special verdicts in criminal cases in this State is "discouraged." *Id.* at 643, 677 *A.2d* at 1127.

In the narrow circumstances presented here, we can simplify matters and provide the trial bench with a manageable procedure to follow. An unembellished special verdict form that asks the jury to identify the predicate felony on which the jury bases its felony murder conviction is a more reasonable approach to the merger question. This approach does not unduly expand *Rule* 3:19–1(b); indeed, it is within its spirit. If the Rule permits a jury to use a special verdict when dealing with multiple charges, an often daunting task, then it follows with greater force that a jury should be allowed to provide a one-word answer when asked to identify the predicate felony. Thus, for example, in *State v. Lado, supra*, 275 *N.J.Super.* at 157, 645 *A.2d* at 1205, a special verdict form was allowed where there was a question of merger with

respect to possession of a weapon for an unlawful purpose and a substantive offense committed with that weapon. Judge Stern, Chair of our Criminal Practice Committee, writing for the panel in *Lado,* recognized the opinion's slight extension of *Rule* 3:19–1(b), stating that "[w]hile *R.* 3:19–1(b) was adopted ... essentially to clarify which degree of offense the jury found applicable, we see no problem with its use in this context." *Id.* at 158 n. 10, 645 *A.*2d at 1206 n. 10.

## C.

■ We observe, finally, that the State opposes the use of a special verdict sheet on several grounds. First, it claims that "the Appellate Division has not provided any guidance as to how juries should be instructed to make such a choice." The State's objection to this procedure is readily vaulted because that guidance is straightforward: the verdict sheet should simply and directly ask the jury to identify the felony or felonies that form the predicate for the conviction of felony murder.

The State further objects to the use of a special verdict form because it "would be no help at all if the jury finds that defendant's felony murder conviction is based on more than one predicate crime." The State reasons that, "[i]n those cases, the trial courts would be faced with precisely the same dilemma [posed here]: which predicate crime should merge?" The answer is simple. In those instances where the jury designates more than one felony as the predicate to a felony murder conviction, the trial court should apply the standard we earlier set forth: only the predicate felony that set in motion the chain of events leading to the murder merges into the felony murder conviction.

## VI.

■ We must now address the application of these principles to this case. Here, there was no request for a special verdict form and the jury found defendant guilty of, among other charged offenses, felony murder and, separately, the predicate robbery and

burglary felonies. After it conducted its merger analysis, the sentencing court imposed separate concurrent sentences for felony murder, first-degree armed robbery, second-degree burglary, third-degree possession of a weapon for an unlawful purpose, and third-degree burglary. However, because we hold that, in a felony murder prosecution, the predicate felony that was "first-in-time"—here, defendant's conviction for third-degree burglary under count seven of the indictment—must merge into the felony murder conviction, we must remand for correction and re-sentencing.

The judgment of the Appellate Division is reversed and the matter is remanded to the trial court to vacate defendant's sentence on count five of the indictment, merge the third-degree burglary conviction (count seven) into the felony murder conviction (count two), merge the fourth-degree criminal trespass conviction (count eight) into the first-degree armed robbery conviction (count five), and re-sentence defendant accordingly.

*For reversal and remandment*—Chief Justice PORITZ, Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.