**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3324-21

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

LAWRANCE A. BOHRER,
a/k/a LAWRANCE BOHRER,
LARRY BOHRER, and
LAWRENCE A. BOHRER,

 Defendant-Appellant.

_____

Argued January 23, 2025 – Decided February 3, 2025

Before Judges Mawla, Walcott-Henderson, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 17-07-0536.

Susan L. Romeo, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Susan L. Romeo, of counsel and on the brief).

Michael C. Mellon, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause

for respondent (Elizabeth Parvin, Acting Gloucester County Prosecutor, attorney; Michael C. Mellon, on the brief).

PER CURIAM

Defendant Lawrance A. Bohrer appeals from a May 3, 2022 judgment of conviction entered after a jury found him guilty of accomplice to felony murder, N.J.S.A. 2C:2-6 and 2C:11-3(a)(3); reckless manslaughter, N.J.S.A. 2C:11-4(b)(1); accomplice to reckless manslaughter, N.J.S.A. 2C:2-6 and 2C:11-4(b)(1); accomplice to robbery, N.J.S.A. 2C:23-6 and 2C:15-1(a)(1); and theft by unlawful taking, N.J.S.A. 2C:20-3(a). He also challenges his sentence. We affirm his convictions, except for the first-degree robbery, and vacate his sentence for reconsideration for the reasons expressed in this opinion.

On March 13, 2017, Michael Fazzio, the victim in this matter, was found by his father lying on the floor of his home with a couch on top of him, not moving. Emergency services later pronounced Fazzio dead.

When police arrived, they found Fazzio's hands and feet tied behind him with duct tape, his body and face wrapped in blankets secured with duct tape, and an orange extension cord tied around his body. The blanket and duct tape around his head appeared to be cut to create a small opening in the mouth area. The police observed blood on the carpet next to and under Fazzio's body, and

blood stains on his pants and shirt. There were blood stains around his wrists and hands. One of Fazzio's pants pockets was pulled inside out, and an empty sleeve for a TD Bank debit card lay underneath his body.

A crime scene investigator from the Gloucester County Prosecutor's Office responded to the scene and noted none of the doors or windows showed signs of forced entry. The only area of the house which appeared disturbed was the living room, where Fazzio was found. A medical examiner later ruled the cause of death was either "positional asphyxia"—meaning his body ran out of energy to breathe because he was "hog tied," or "mechanical asphyxia"–meaning he could not breathe because his face was covered.

Detective Anthony Garbarino was the lead investigator. Based on his conversation with Fazzio's father, Fazzio was last seen alive on March 10, 2017. The detective also interviewed Fazzio's daughter, who checked his bank accounts following his death and saw a withdrawal of $500 from the checking account. She reported the amount withdrawn was unusual for her father, who "was a very routine person" and primarily used the account as a savings account. The withdrawal occurred on March 11 at 12:07 a.m. at a bank in Clayton.

Investigators obtained surveillance video from the bank, including the drive-through automated teller machine (ATM), which showed a person walking

3

up to the drive-through ATM wearing: a baseball cap; a green hooded sweatshirt with a grey hooded sweatshirt on top with both hoods over the cap; a bandana over their face; and black, gray, and neon gloves. Detective Garbarino also reviewed the footage to understand the suspect's route of travel to and from the ATM.

Investigators also obtained surveillance footage from the area around the bank, including a police department located across the street; a business near the police station; and a nearby private residence. The footage captured a Jeep Wrangler driving by the bank twice, just after midnight, around the time of the ATM withdrawal.

Darryl Senior, a person unrelated to the case, found Fazzio's cell phone in two pieces approximately seven or eight blocks south of the police department. He took the phone home, re-assembled it, and tried to track down the owner by calling the only saved contact in the phone: "Tommy." Tommy told Senior he knew the owner of the phone and would pick it up from Senior the following day, but he never came.

Police obtained Fazzio's phone from Senior. Detective Garbarino testified the phone had one saved contact, named "Tommy B[.,]" with a number later identified as belonging to Thomas Bergholz. There were calls between Fazzio's

4

and Bergholz's phones on March 12, the day before the discovery of Fazzio's body.

Detective Sergeant Gregory Malesich testified he was tasked with finding stores that sold gloves matching the ones worn by the person in the ATM surveillance video. He eventually found a pair at an auto parts store.

Police located Bergholz on March 14. He was wearing the same clothing worn by the person in the ATM video and appeared to have blood on his pants, sweatshirt, and boots. Detective Garbarino and Detective Sergeant Bryn Wilden interviewed Bergholz, which led Detective Sergeants Malesich and Wilden to interview defendant the same day.

Defendant's interview was recorded and played for the jury at trial. He waived his Miranda[1] rights and provided his phone number to investigators. Defendant told investigators he resided with two roommates, Clair Ann Foster and Kimberly Beal, in Pittsgrove. He knew Bergholz, but denied they were close friends. Defendant owned a lake house, but no one was permitted to reside there during the off-season. When investigators informed defendant that Bergholz told them he recently had stayed there, defendant denied knowing this and claimed he told Bergholz not to stay there.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3324-21

Defendant searched his phone for his last communications with Bergholz, but said he might have deleted his number because he did that "every once in a while" if he had not spoken to the person recently, or if he was mad at them. He no longer associated with people who did things that he did not approve of and expressed Bergholz needed to "straighten [him]self up" for his two daughters. Defendant claimed he did not speak to Bergholz because he stole Foster's social security card and withdrew money from her bank account.

Defendant claimed he last saw Bergholz between March 3 and 5. Investigators asked if Bergholz had called defendant a week before the interview for a ride and asked if defendant had given him one. Defendant responded, "maybe I did, maybe I didn't." He claimed he may have ignored the call, but then said: "I don't think so, though." Investigators then told defendant that Bergholz said defendant had given him a ride to the lake house the week before. Defendant denied this and claimed Bergholz had a drug problem, was having problems with his parents, and may have been residing "in one of those houses back there on that other property."

Defendant stated he owned a 1998 blue Jeep Wrangler. He claimed he often lent his car out, including to Bergholz, but did not "keep tabs" on it and

6

could not recall whether anyone had used it over the weekend. He last lent it to Bergholz around the last time he saw him, which was March 3.

Defendant mentioned he had previously owned a house in Pittsgrove, which burned down. When investigators asked if he had accused someone of burning it down, defendant responded: "That person's a frigging piece of garbage but—I don't talk with him. I haven't seen him in a long time." Investigators later learned defendant was referring to Fazzio.

Defendant said he first met Fazzio in 2013, and although they were friends then, he no longer associated with Fazzio because they did "not see eye to eye," and Fazzio was "just a scumbag." Defendant explained he was friends with Fazzio's then-girlfriend, and Fazzio was jealous and once threw rocks at him when he was with the girlfriend. Fazzio falsely accused him of assault, but defendant denied this allegation, claiming he does not "get violent like that."

Defendant said the last time he saw Fazzio was approximately one or two weeks before the interview, when he was driving on the road and Fazzio was on his bicycle. At the time, he wished he "could run [over] this little bitch." Investigators asked defendant if he went to Fazzio's home within the last week, but defendant could not remember. When they pressed defendant, he claimed he was not at the home. Defendant then said he was unsure and responded that

A-3324-21

he does not "talk to the guy," "want[ed] nothing to do with him," and did not want to "discuss him."

When investigators told defendant they were questioning him because Fazzio "got hurt this weekend" and "got beat up," he appeared to become emotional. Investigators again asked defendant if he was at Fazzio's home the previous weekend and he responded as follows:

> Look, man, you know what, [let] the sucker sit and rot in his own stinking grave, his own bed. Let him lay in it. You know what? . . . He's a man suffering as it is every[ ]day because he drinks and all this other stuff and nobody wants to be near him any[]way.

When investigators asked defendant if, based on his comments, he thought Fazzio was dead, he clarified that he "said let him sit there. You made your bed" and again denied he went to Fazzio's home the preceding week.

Investigators noted defendant had something sticking out of his pocket. Defendant responded he had a pair of gloves and his phone. They instructed him to place the items on the table. Defendant claimed the gloves were his work gloves. When investigators informed him the gloves were involved in the crime, and they had photographs of them, he invoked his right to remain silent and the interview ended.

A-3324-21

Investigators interviewed Bergholz again on November 15, 2019. Detective Garbarino testified he was not involved in Bergholz's plea negotiations relating to his cooperation with the investigation. Bergholz had his attorney present for the interview and had spoken with him immediately prior to the interview. He told investigators he and defendant had tied up Fazzio, robbed him, and left him in his home on March 10, 2017.

At trial, Bergholz testified that in 2017, he was addicted to heroin and did not have a clear memory about the events of the weekend of March 10. He also acknowledged he had been arrested in the past for shoplifting, and frequently asked friends for money or stole from them to support his addiction.

Bergholz testified he was friends with defendant and by 2017 had known him for four years. At the time of Fazzio's death, Bergholz had been staying in defendant's lake house, which was located a mile from Fazzio's home. Bergholz knew both men, but Fazzio and defendant did not get along.

On March 10, defendant picked up Bergholz in his Jeep around 6:00 p.m. to go buy drugs, which they both used. The pair first traveled to Camden and then Glassboro. Around 8:00 or 9:00 p.m. they stopped at a store, where Bergholz stole a pair of boots.

A-3324-21

On their way back to the lake house, Bergholz said he and defendant needed more money to buy drugs. They were almost at the lake house but realized they were near Fazzio's home so, Bergholz said, they "decided to go try to get some cash real quick" from Fazzio. They parked defendant's Jeep on the other side of a field near Fazzio's home. Bergholz said it was cold, and he wore a green sweatshirt and gardening gloves, and defendant had on a grey sweatshirt and black and yellow mechanic gloves.

Bergholz testified the plan was to "[j]ust grab some cash and run." They did not plan on hurting Fazzio and did not bring anything with them to restrain him. When they reached Fazzio's home, they looked through a window and saw him laying on a couch in the living room, watching television. They entered the house through an unlocked back door. When they reached the living room, Bergholz said defendant "grabbed a blanket and threw it over [Fazzio's] head" and then they "both kind of jumped on him to restrain him." There was duct tape in the home. Bergholz held Fazzio, while defendant "duct taped his legs and feet" and then duct taped the blanket around him. Fazzio said he could not breathe, so Bergholz "cut a hole in the blanket."

Bergholz testified he and defendant began searching the house for money. He checked Fazzio's pockets but found no cash, and then went to search his

10

bedroom. They did not find any money, but saw Fazzio's credit card on the counter, so Bergholz took it and asked Fazzio for the pin. Defendant then took Fazzio's cell phone.

Bergholz recalled there was a heater hooked to an orange extension cord. He testified defendant had wrapped the cord around Fazzio's body, although he did not witness him do it. Before they left Fazzio's home, defendant pushed the couch on top of Fazzio's body and then said: "He's good. We got time to hit the ATM." Bergholz thought Fazzio would be able to free himself and would be okay.

Bergholz and defendant drove to the nearest bank to withdraw money from Fazzio's account. Defendant parked on a street adjacent to the bank and Bergholz walked to the ATM to retrieve the cash. Bergholz wore a bandana he found in the Jeep over his face and wore the black and yellow mechanic gloves defendant had worn, because they enabled him to press the buttons on the ATM. He withdrew $500, which was the maximum amount permitted by the ATM. Bergholz identified himself as the person in the ATM surveillance footage. He returned to the Jeep, which made a U-turn, and drove towards Glassboro. The men stopped at a convenience store for gas, cigarettes, and sandwiches, and then went to buy drugs.

As the pair drove out of Clayton, defendant threw Fazzio's cell phone out of the window. Bergholz did not recall what happened to Fazzio's ATM card. He believed he left the gloves he wore to the ATM in the Jeep's center console.

Bergholz and defendant went to Philadelphia to buy drugs. At approximately 3:00 a.m., defendant dropped Bergholz off near the lake house, using a back entrance at defendant's suggestion, because they assumed Fazzio was free and may be looking for them.

Bergholz did not see defendant again. However, he messaged him the next day, advising him to throw his clothes away. He "probably" sent defendant additional messages, but defendant never responded. Bergholz thought he also tried calling defendant, but did not remember whether defendant returned his calls. He never discussed what had happened with defendant and never returned to check on Fazzio.

Bergholz recalled receiving a call from Fazzio's phone over the weekend, from someone who found the phone. He never retrieved the phone because he was too focused on getting high.

Bergholz testified he had lied to investigators in March 2017 when he told them he had nothing to do with what happened to Fazzio. He acknowledged he initially faced a murder charge with a possible sentence of thirty years to life.

12

However, on November 15, 2019, he entered a plea agreement and pled guilty to aggravated manslaughter. Although aggravated manslaughter carries a sentence between ten-to-thirty years, the State agreed to recommend a sentence within a range of ten-to-twenty years in exchange for his plea. Bergholz was sentenced to thirteen years of incarceration in July 2022.

As a condition of Bergholz's plea, he agreed to testify truthfully at defendant's trial. If he failed to do so, the State could withdraw the plea agreement.

Foster and Beal also testified for the State. Foster explained she had a brain injury that impacted her memory. Since she could not recall the statement she gave investigators on March 15, 2017, the State played a recording of it for the jury.

Foster stated she had met Bergholz through her boyfriend, and Bergholz introduced her to defendant. She lived with defendant temporarily at his lake house, and she and defendant resided with Beal. Foster recalled that around March 3, 2017, Bergholz and his girlfriend had stayed in their home for three or four nights. At the end of the stay, she realized Bergholz had stolen over $200 from her bank account. She explained Bergholz had a history of stealing from

others, including his mother, who kicked him out of her home, and his employer, who terminated him.

On the weekend of Fazzio's death, Foster recalled that on either Friday or Saturday, defendant had left the home at 3:00 p.m. and did not return until 4:00 a.m. the following morning. The following day he stayed home all day. Over the course of the next two days, Bergholz repeatedly called defendant's phone, but defendant kept ignoring him and turned his ringer off. At one point, defendant changed the name of Bergholz's contact on his phone to "Jill."

Foster testified it was unusual for defendant to stay out until 4:00 a.m. because he was usually home by 9:00 or 10:00 p.m. and in bed by 10:00 or 11:00 p.m., and it was "weird" for defendant to stay home for a few days. Likewise, it was strange for defendant to ignore Bergholz's calls because he paid defendant to drive him around.

Beal testified defendant resided in her Pittsgrove home for several months. On the weekend of Fazzio's death, defendant left at 3:00 p.m. on Friday, and did not return until 3:00 or 4:00 a.m. She noted this was unusual for defendant. Beal recalled Bergholz tried to get in touch with defendant, but defendant did not answer because he was helping her fix an outlet. She recalled there was only one phone call from Bergholz, and she did not know whether defendant was

14

otherwise ignoring his calls. Beal did not think anyone else had used defendant's car that weekend.

Detective Garbarino testified investigators seized Bergholz's phone following his interview and reviewed its contents pursuant to a search warrant. Detective Brian Perticari testified as an expert in cell phone extractions and forensics. He analyzed defendant's and Bergholz's phones but was only able to extract data from the latter.

Bergholz's phone listed defendant's contact as "Larry Bohrer Lake" and then another contact with a different number saved as "Larry Lake House." The phone's last contact with the second number was on December 5, 2016, and the last contact with the former number was on March 14, 2017, at 1:01:32 p.m.

The detective testified that a search for "'Larry' plus 'Bohrer' plus 'Lake'" on Bergholz's phone, yielded 114 hits, including 104 phone calls, and eight text messages. On March 11, 2017, at 4:47:26 a.m., Bergholz's phone sent a message to the Larry Bohrer Lake contact stating: "Get everything out of your truck that I we or 'cause them clothes are dirty." Detective Garbarino interpreted this text to read: "Get everything out of your trunk that I/we wore, because them clothes are dirty." Approximately fourteen seconds later, Bergholz's phone sent another message, stating: "You know what I mean."

15

On March 12, 2017, Bergholz's phone sent a message to defendant's phone stating: "You there" at 4:41:36 p.m.; and another stating: "Larry, answer" at 5:46:26 p.m. Then, on March 13, 2017, Bergholz's phone sent a message at 3:51:16 p.m., stating: "Larry, I need them saws. I got them sold."

Bergholz's phone made several calls both before and after Fazzio's death. On March 9, 2017, phone records reflected that between 8:35:22 p.m. and 9:06:16 p.m., he made four calls to defendant all lasting ten seconds or less, and an additional call at 11:11:34 p.m.

On March 10, there were several calls between Bergholz's and defendant's phones—both incoming and outgoing—between 12:06:38 p.m. and 3:11:44 p.m. The calls varied in duration, from approximately twenty seconds to ninety seconds. On March 11, between 4:30:04 p.m. and 5:00:27 p.m., Bergholz's phone made five calls to defendant's phone, each between three to four seconds in duration. On March 12, he made numerous calls to defendant's phone, between 12:08 p.m. and 7:15:25 p.m., all of which were under eight seconds long, except for the call at 6:59:27 p.m., which lasted forty seconds. Bergholz's phone log showed a call from defendant's phone at 2:39:40 p.m., which lasted one minute and twenty-eight seconds. On March 13, his phone made four calls to defendant in the morning and afternoon, all of which lasted a few seconds

16

duration. On March 14, Bergholz's phone made three calls to defendant, between 10:29 a.m. and 1:53:53 p.m., also lasting a few seconds each in duration.

Detective Garbarino further testified regarding the contacts between Bergholz's and Fazzio's phones. On March 11, call logs reflected calls at 9:58:59 p.m. and 10:01:23 p.m., but did not specify whether the calls were incoming or outgoing, or the duration. However, there was an outgoing call to Fazzio's phone at 10:14:10 p.m., lasting one minute and twenty-seven seconds.

FBI Agent Christopher Baker also testified as an expert in cell phone forensics and extractions. He extracted data from the memory chip in defendant's phone, including deleted files. Defendant's phone had 179 contacts, fifty-two of which had been deleted. The deleted contacts included both "Tommy" and "Tommy B," which were associated with Bergholz's number. The last contact with Bergholz's number was on March 14, 2017.

Agent Baker also testified regarding the text messages he found on the phone, including thirty-nine messages, which were deleted and recovered. He found no messages between March 10, and 13, 2017, but noted there were messages both before and after that date range.

17

Investigators collected the orange extension cord used to wrap Fazzio's body, the two blankets wrapped around his body, which contained suspected blood stains, and the duct tape used to secure his ankles and wrists, which also had suspected blood stains. These items were submitted for genetic testing.

Investigators also collected the clothing defendant wore to the interview and the mechanic gloves he had in his pocket. The gloves were sent for testing, because they resembled those worn by the suspect in the ATM footage and had suspected blood stains. Pursuant to search warrants, investigators collected from defendant's residences a green sweatshirt with suspected blood stains and a black and white bandana resembling the one worn by the suspect in the ATM footage, which were sent for genetic testing.

Bergholz's clothing was also collected following his interview, including a green hooded sweatshirt, a t-shirt, a white tank top, camouflage pants, and boots. All except the white tank top contained suspected blood stains. Detective Garbarino testified Bergholz likely had been wearing these same items around the time of Fazzio's death, and the sweatshirt appeared to be the one worn by the suspect in the ATM footage. The sweatshirt and boots were sent for genetic testing.

A-3324-21

The testing revealed three DNA profiles on the mechanic's gloves. Fazzio was identified as the major contributor of the DNA. There was insufficient information to determine the identity of the other two contributors. The bandana tested negative for blood but positive for saliva. Genetic testing revealed defendant as a source of that DNA. Bergholz was identified as the source of the major DNA profile for the samples tested from the sweatshirt.

The genetic testing revealed Fazzio as the major contributor of the DNA on the extension cord. His DNA was also found on the duct tape, along with a female third-party as a major contributor. However, investigators confirmed she was hospitalized overnight from March 10 through March 11. The parties stipulated the duct tape samples from Fazzio's ankles and the blanket over his head matched Fazzio's DNA. Another piece of duct tape from his head excluded Bergholz and defendant as possible contributors but captured the third-party DNA of the female.

Based on this evidence, defendant was convicted of the offenses we outline at the outset. The jury acquitted him of: felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2); aggravated manslaughter, N.J.S.A. 2C:11-4(a); accomplice to murder, N.J.S.A. 2C:2-6(a); first- or second-degree robbery, N.J.S.A. 2C:15-1(a)(1), (2), and/or (3); third-

degree reckless endangerment, N.J.S.A. 2C:24-7.1(a)(3); and third-degree criminal restraint, N.J.S.A. 2C:13-2(a).

Defendant raises the following points on appeal:

POINT I

DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE THE COURT ABUSED ITS DISCRETION WHEN IT PERMITTED THE STATE TO PLAY THE VIDEO OF . . . BERGHOLZ'S STATEMENT SEVENTEEN DAYS AFTER BERGHOLZ HAD TESTIFIED AT TRIAL BECAUSE THE VIDEO, MADE THE DAY HE PLEADED GUILTY TWO YEARS EARLIER, FAILED TO MEET THE ADMISSIBILITY REQUIREMENTS AS A PRIOR CONSISTENT UNDER N.J.R.E. 607 AND BECAUSE ITS ADMISSION WAS NOT HARMLESS.

POINT II

DEFENDANT'S CONVICTIONS BASED ON ACCOMPLICE LIABILITY FOR FIRST-DEGREE ROBBERY AND ACCOMPLICE LIABILITY FOR FELONY MURDER MUST BE REVERSED, BECAUSE MULTIPLE ERRORS IN THE RELATED JURY INSTRUCTIONS HAD THE CLEAR CAPACITY TO LEAD TO AN UNJUST RESULT (not raised below).

1.     It Was Plain Error Not To Instruct The Jury As Part Of The Accomplice Liability Instructions That, Pursuant To State v. Whitaker, 200 N.J. 444 (2009), Defendant Could Not Be Found Guilty As An Accomplice To Robbery Or As An Accomplice To Felony Murder, Based Solely On

20

His Conduct After Someone Else Had Robbed And Killed The Victim.

2. It Was Plain Error For The Court To Instruct The Jury In The Accomplice Liability Instructions On All Of The Possible Elements Of Second-Degree Robbery And None Of The Elements Of First-Degree Robbery, Which Was The Only Theory Argued By [The] State Based On The Victim's Death, And Then To Allow Defendant To Be Convicted And Sentenced As An Accomplice To First-Degree Robbery, Which Was Not Even A Question On The Verdict Sheet.

POINT III

DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE HIS DUE PROCESS RIGHTS WERE VIOLATED WHEN THE COURT HALTED ONGOING JURY DELIBERATIONS FOR [FOURTEEN] DAYS TO ACCOMMODATE THE VACATION SCHEDULES OF THE JUDGE AND THE ATTORNEYS (partially raised below).

POINT IV

DEFENDANT'S SENTENCE MUST BE REVERSED BECAUSE IT WAS THE RESULT OF MULTIPLE LEGAL AND FACTUAL ERRORS AND BECAUSE IT WAS EXCESSIVE.

1. Defendant's Sentence Must Be Reversed Because The Court Failed To Provide A Reasoned Explanation For Finding Multiple Contradictory Aggravating And Mitigating Factors And Because Those Findings Were Not Supported By Sufficient, Competent[,] Credible Evidence In The Record.

21

2. Defendant's [Forty]-Year Sentence As An Accomplice To Felony Murder Was Grossly Excessive, Given His Lack Of Prior Felony Convictions, The Jury's Acquittals On The Own-Conduct Robbery And Murder Charges, And . . . Co-Defendant's [Thirteen]-Year Sentence For Aggravated Manslaughter.

## I.

In point I, defendant argues the trial judge should not have permitted the State to play the video of Bergholz's November 2019 statement because it was not a prior consistent statement and was therefore inadmissible under N.J.R.E. 607(b). He asserts the statement did not rebut a charge of recent fabrication by Bergholz or a motive to lie because the interview occurred after Bergholz entered a plea agreement. The statement was also inadmissible hearsay because it was introduced through Detective Garbarino's testimony.

Defendant claims the error prejudiced his ability to have a fair trial because Bergholz's statement contained significant, additional allegations that were not part of the trial testimony, which were damaging to defendant. Moreover, the video had the effect of duplicating Bergholz's testimony, allowing the jury to listen to his claims twice at trial, and then two more times during deliberations, when they asked to replay both his in-court testimony and his

22

interrogation. The trial judge further erred by not instructing the jury the admission of the prior statement was not to be considered substantive evidence.

We review evidentiary rulings under an abuse of discretion standard and uphold them unless there was "a clear error of judgment." State v. Outland, 458 N.J. Super. 357, 364 (App. Div. 2019) (quoting State v. Perry, 225 N.J. 222, 233 (2016)). Only errors "that have the clear capacity to cause an unjust result" will warrant reversal of a conviction. State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Prall, 231 N.J. 567, 581 (2018)). Legal conclusions drawn from those facts are reviewed de novo. State v. Radel, 249 N.J. 469, 493 (2022).

N.J.R.E. 607(b) prohibits the admission of a prior consistent statement "except: (1) to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive, and (2) as otherwise provided by the law of evidence." N.J.R.E. 803(a) states a prior consistent statement is admissible for the purposes outlined in N.J.R.E. 607(b)(1) if "[t]he declarant-witness testifies and is subject to cross-examination about . . . the statement."

While N.J.R.E. 607(b) permits the use of a prior consistent statement "to rehabilitate a witness after impeachment" to show the statements were made prior to the improper motive to fabricate, State v. Pillar, 359 N.J. Super. 249, 281 (App. Div. 2003), N.J.R.E. 803(a)(2) allows the admission of the statement

23

as substantive evidence. State v. Torres, 313 N.J. Super. 129, 158 (App. Div. 1998); see also Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 607 (2023-2024) ("Note that N.J.R.E. 803(a)(2) now permits the substantive use of prior consistent statements as an exception to the hearsay exclusionary rule, under the same conditions set forth in N.J.R.E. 607 for using such statements to support the credibility of a witness.").

Prior to trial, the State moved to preclude "[a]ny mention of the sentence" promised to Bergholz under the plea agreement. The trial judge ruled counsel could establish Bergholz pled guilty to a lesser offense carrying a lesser penalty but could not reference the specific length of the sentence. The judge reiterated her ruling prior to Bergholz's testimony and instructed Bergholz accordingly.

Bergholz then testified he gave police a statement on November 15, 2019. The only other reference to his November 2019 statement was when Bergholz told the jury the agreement required him to testify consistent with his November 2019 statement, otherwise the plea agreement could be vacated. He stated his testimony was consistent with his statement. Later, Bergholz was confronted with his plea agreement and agreed it only required him to testify truthfully.

On the next day of testimony, the defense moved to re-open cross-examination of Bergholz pursuant to State v. Jackson, 243 N.J. 52 (2020), which

holds counsel may cross-examine a cooperating witness about his plea bargain and sentencing exposure. Separately, the State sought to introduce Bergholz's November 2019 statement under N.J.R.E. 607, to undercut the defense's suggestion that his testimony was a recent fabrication or the result of undue influence. The State argued that, under N.J.R.E. 607(b), it could play the statement through Bergholz or Detective Garbarino, who could properly authenticate it.

The defense alleged N.J.R.E. 607(b) only permitted admission of the prior statement through the witness whose credibility was in dispute. Further, Bergholz's statement was not tantamount to a recent fabrication because his testimony was consistent with his prior statement from the time of his plea agreement. The defense also noted its purpose of re-calling Bergholz was due to the judge reversing her prior ruling on whether he could be questioned about his sentence. Thus, the State should not be permitted to use the opportunity to elicit new evidence or play a new statement. The defense pointed out both sides had already questioned Bergholz about the prior consistent statement from November 2019, and the issue had been addressed.

The State responded this was appropriate cross-examination based on the defense's anticipated continued cross-examination of Bergholz. The purpose of

25

the testimony was to show Bergholz's made the prior consistent statement before he had any motive to falsify.

The trial judge concluded the State could present Bergholz's prior statement under N.J.R.E. 607, to bolster his credibility and rebut an expressed or implied charge of improper influence or motive at the time of his prior statement. She ruled the statement was not admissible for its substance but to show that "at a time prior to there being the benefit of the plea, he certainly had a statement that was consistent with the one that he gave in the courtroom itself."

The judge noted, regardless of whether defendant re-opened the cross-examination to question Bergholz about his sentencing exposure under the plea agreement pursuant to Jackson, the State could introduce Bergholz's prior statement through Detective Garbarino or Bergholz. The defense ultimately recalled Bergholz and questioned him about the plea agreement. The cross-examination did not broach Bergholz's November 2019 statement. On re-direct, the State only asked Bergholz whether his testimony was truthful and then played his November 2019 statement during Detective Garbarino's testimony.

We part ways with the trial judge's view that Bergholz's November 2019 statement was made "prior" to "the benefit of the plea." Our review of the record shows the statement was contemporaneous with his plea, because it was made

during the plea negotiations and appears to be what facilitated the plea agreement. While the plea agreement may not have been in place at the time Bergholz gave his statement, if he had a motivation to fabricate, it likely already existed.

Our law does not require a strict temporal requirement for determining the admissibility of a prior consistent statement to refute a claim of recent fabrication, improper influence, or motive to fabricate. In State v. Muhammad, 359 N.J. Super. 361, 388 (2003), we held "the purpose of N.J.R.E. 803(a)(2) is best advanced by not requiring a strict temporal requirement, but instead allowing trial judges to evaluate relevance under all of the circumstances in which the prior statement is proffered." In this context, "whether the statement was made before the asserted motive or influence to fabricate is a substantial factor in determining relevance," but it is not controlling. Ibid. However, "[w]here there are no factors other than the alleged improper influence or motive influencing the prior statement or its making, a post-motive statement should ordinarily be excluded." Ibid.

In Muhammad, a cooperating witness testified consistent with his prior statement to the police; he had entered into an agreement with the State that it would not file charges against him in exchange for his truthful testimony; during

cross-examination, defense counsel strongly attacked his credibility; and following his testimony, the State introduced his prior consistent statement through the interrogating officer, over the defendant's objection. Id. at 384-85. We upheld the admissibility of the cooperating witness's testimony, noting he was cross-examined "forcefully" about whether his earlier statements were consistent with his taped statement or in-court testimony. Id. at 388. The prior statement, therefore, was used to rebut the charge his testimony was the product of an improper influence or motive to fabricate and was properly admitted at trial. Id. at 389.

We applied the principles from Muhammad in State v. Moorer, 448 N.J. Super. 94, 111 (App. Div. 2016), where there were allegations of recent fabrication under N.J.R.E. 803(a)(2). We defined a recent fabrication in terms of whether the prior consistent statement was made "before the motive to fabricate arose." Id. at 110. In this context, the prior consistent statement's probative value is "clear" because it serves as "a square rebuttal of the charge that the testimony was contrived as a consequence of that motive." Id. at 111 (quoting in the second instance, Tome v. United States, 513 U.S. 150, 158 (1995)). We stressed "New Jersey has never adopted a strict temporal requirement for the admission of a prior consistent statement." Ibid. Therefore,

in Moorer, we ruled admissible a detective's prior consistent statement—that he saw the defendant try to hide evidence—which he had not mentioned in his police report but had mentioned in his pre-trial testimony. Id. at 106-07. The pre-trial testimony was admissible as a prior consistent statement to help refute the allegation of recent fabrication, even though some of the motive to fabricate may have existed prior to when the detective made his statement. Id. at 108-11.

Although these cases discuss N.J.R.E. 803(a)(2), whereas here the trial judge made her ruling based on N.J.R.E. 607(b), we nonetheless conclude there was no abuse of discretion because our role is to review judgments and orders, not trial court opinions. See Bandler v. Melillo, 443 N.J. Super. 203, 210 (App. Div. 2015). The record shows defense counsel effectively highlighted the credibility concerns surrounding Bergholz's November 2019 statement, namely that he had previously denied any involvement in the crime and only implicated himself and defendant after being offered a beneficial plea deal. Thus, it was for the jury to assess whether his November 2019 statement was influenced by a motive to fabricate. See, e.g., Muhammad 359 N.J. Super. at 389 (recognizing that the statement could be interpreted as being influenced by improper motive but finding that it "was not irrelevant to rebut the charge that [the witness's] testimony was the product of an improper influence or motive to lie").

Therefore, under these facts, there was no temporal bar to the use of Bergholz's November 2019 statement as a prior consistent statement to rebut allegations of improper motive.

Our law does not confine the presentation of a prior consistent statement only through the declarant. See Garcia, 245 N.J. at 430-32 (police video corroborating defense witnesses' claims that the police did not speak to them was admissible as a prior consistent statement under N.J.R.E. 803(a)(2), and played after the witnesses had completed their testimony); Muhammad, 359 N.J. Super. at 385; see also State v. Brown, 236 N.J. 497, 528-29 (2019) (the Court instructing that on re-trial, a detective could testify about the wife's prior consistent statement under N.J.R.E. 803(a)(2), to rebut an express charge of recent fabrication about the wife's testimony regarding her husband's dying declaration); Torres, 313 N.J. Super. at 158-59 (noting detectives could testify that the co-defendant previously had told them the defendant committed the crime, as a prior consistent statement to rebut a charge of recent fabrication); State v. Nunez, 436 N.J. Super. 70, 76-77 (App. Div. 2014) (acknowledging the general proposition that a state witness can testify about a cooperating witness's prior consistent statement to him, to refute the allegation of cooperating witness's recent fabrication, but taking issue with the fact that the State's witness

was a defense-investigator). Nevertheless, N.J.R.E. 803(a) contemplates the statement will be introduced and the declarant will be subjected to cross-examination about it.

Although Bergholz had not provided extensive testimony regarding his November 2019 statement prior to the introduction of the prior consistent statement, as was the case in Garcia, 245 N.J. at 430-32, and Muhammad, 359 N.J. Super. at 385, the defense knew the State intended to introduce the statement prior to Bergholz being recalled. The defense had ample opportunity to cross-examine him about the statement.

Even if the trial judge erred in admitting the statement through Detective Garbarino, the error was harmless. R. 2:10-2. Bergholz's November 2019 statement included additional details, which were not a part of his trial testimony, namely that defendant: found the duct tape used to tie up Fazzio; ran the duct tape around Fazzio's face; and gave Bergholz his sweatshirt, gloves, and bandana to wear. However, Bergholz had already testified it was defendant who had duct taped the blanket around Fazzio, and that he wore defendant's mechanic gloves to the ATM. The additional detail contained in the November 2019 statement was not clearly capable of producing an unjust result.

31

Defendant's argument he was prejudiced because the jury heard the statement more than once also lacks merit. And no limiting instruction was required because the statement was admissible under N.J.R.E. 803(a)(2). See State v. Swint, 328 N.J. Super. 236, 255 n.3 (App. Div. 2000).

II.

In point II, defendant claims the trial judge's instruction to the jury on accomplice liability was erroneous and necessitates reversal of his convictions on first-degree robbery as an accomplice to Bergholz and felony murder. He contends the judge: did not instruct the jury that he could not be found guilty of afterthought robbery; did not charge the jury on the elements of first-degree robbery as an accomplice; and the verdict sheet failed to distinguish between first- or second-degree robbery when it asked the jury to determine whether defendant was guilty of robbery based on accomplice liability.

Proper jury instructions are essential for a fair trial. State v. Scharf, 225 N.J. 547, 581 (2016). "A trial court is vested with discretion in delivering the jury instructions . . . most applicable to the criminal matter before it." State v. Funderburg, 225 N.J. 66, 80 (2016) (citing State v. Ernst, 32 N.J. 567, 583-84 (1960)).

"When a party does not object to a jury instruction, [we] review[] the instruction for plain error." State v. Montalvo, 229 N.J. 300, 320 (2017) (citing R. 1:7-2; State v. Wakefield, 190 N.J. 397, 472-73 (2007)). The party challenging the instruction must demonstrate "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Id. at 321 (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

We consider how jurors would "'understand the instructions as a whole,'" in light of "'the evidence before them[] and the circumstances of the trial.'" State v. Savage, 172 N.J. 374, 387 (2002) (quoting Crego v. Carp, 295 N.J. Super. 565, 573 (App. Div. 1996)). "The error must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)). "Because a verdict sheet constitutes part of the trial court's direction to the jury, defects in the verdict sheet are reviewed on appeal under the same 'unjust result' standard of Rule 2:10-2 that governs errors in the jury charge." Galicia, 210 N.J. at 388 (citing State v. Wilder, 193 N.J. 398, 418 (2008)).

The indictment charged defendant and Bergholz with accomplice liability for first- or second-degree robbery by

> unlawfully, knowingly and willfully, with the purpose of promoting and facilitating the commission of a crime; specifically in the course of committing a theft, knowingly did inflict serious bodily injury upon, use force upon, threaten immediate bodily injury upon, purposely put [the] victim in fear of immediate bodily injury, commits or threatens immediately to commit a crime of the first or second degree, that is, [r]obbery upon . . . Fazzio, contrary to N.J.S.A. 2C:151[(a)](1) and/or (2)[,] and/or (3), and acted as accomplices of each other . . . .

At the charging conference, counsel and the trial judge agreed the indictment encompassed both first- and second-degree robbery, and the court should instruct the jury on both levels of the offenses. The judge added she would include this information in the verdict sheet as well. Neither the judge, nor counsel raised this distinction when discussing the jury charge for accomplice liability for robbery.

On the first- or second-degree robbery count of the indictment, the judge instructed the jury it must definitively find: (1) defendant was in the course of committing a theft; and (2) while doing so, he "(a) knowingly inflicted bodily injury or used force upon another; (b) threatened another with, or purposely put him in fear of immediate bodily injury; [or] (c) committed or threatened

34

immediately to commit the crime of murder." The judge also instructed that, under the statute, "robbery is a crime of the second degree, except when it is a crime of the first degree," and in this case, whether defendant purposely attempted to kill anyone or purposely inflict or attempt to inflict serious bodily injury. She also instructed that if the State had proven defendant committed the crime of robbery but failed to prove either of the two elements for first-degree robbery, then it must find him guilty of robbery in the second degree.

The judge then generally instructed the jury on accomplice liability, explaining "[a] person is guilty of the offense, if it is committed by his own conduct, or the conduct of another person for which he is legally accountable, or both." She defined legal accountability, and explained a person is an accomplice "if with the purpose of promoting or facilitating the commission of the offense he solicits such other person to commit it, or[], (b) aids, . . . agrees, or attempts to aid such other person in planning or committing it." The judge explained the State contended defendant "was equally guilty of the crimes committed by . . . Bergholz, because he acted as his accomplice, with the purpose that the specific crime charged be committed."

Having already explained the various own-conduct offenses in detail, the judge more succinctly reviewed the underlying offenses, explaining the

elements to find accomplice liability, starting with accomplice liability for felony murder. When charging the jury on accomplice liability for robbery, the judge stated:

> The elements that are required for that charge are[] (a) that . . . defendant was in the course of committing a theft; (b) that while in the course of committing that theft, defendant, number one, knowingly inflicted bodily injury or used force upon another. Number two, inflicts bodily injury or uses force upon another, or threatens another with, or purposely puts him in fear of immediate bodily injury. And, number three, committed or threatens immediately to commit the crime[] of murder.

The trial judge also instructed that to prove defendant's accomplice liability, the State need not present direct evidence of "his accomplice status," a "formal plan to commit a crime," or a verbal agreement, and explained how circumstantial evidence may be sufficient. "Participation and agreement can be established from conduct, as well as the spoken words," and "[m]ere presence at or near the scene does not make one a participant in the crime, nor does the failure of a spectator to interfere make him a participant in the crime." While presence "does not render a person a participant" in the crime, a jury can infer a defendant's involvement based on their presence "in connection with all other circumstances." To be convicted as an accomplice, defendant must also have had "the purpose to participate in that particular crime."

36

Defendant's argument the judge should have instructed the jury that a person cannot be held liable for accomplice liability for robbery based only on their participation after the completion of that robbery is based on Whitaker. 200 N.J. at 448. Whitaker was with a co-defendant when the co-defendant attempted to steal money from the victim and shot him in the process. Id. at 451-52. He claimed he did not know the co-defendant had a gun and intended to rob the victim. Id. at 452. However, other witnesses revealed Whitaker ran from the scene of the crime with the co-defendant, and yelled "put it up, put it up" at the co-defendant, which the State interpreted as him urging the co-defendant to throw away the gun. Id. at 453-54. The State offered two theories of liability for both felony murder and robbery. Id. at 454. First, was the evidence that Whitaker knew of the co-defendant's plan to rob the victim, knew the co-defendant was armed, supported him in his acts, fled from the crime scene with him, and urged him to throw away the weapon. Ibid. Alternatively, the State argued, the jury could convict Whitaker even if he did not share the purpose to rob the victim or participate in the shooting, so long as he aided the co-defendant in discarding the gun. Ibid.

Our Supreme Court held Whitaker could not be found guilty of being an accomplice in the felony murder or robbery based only on his conduct after his

co-defendant "had already robbed and fatally wounded the victim." Id. at 462. He could only be found guilty of hindering. Ibid. This was akin to the previously rejected concept of "afterthought' robbery"—the idea that "a person who committed manslaughter would not be guilty of robbery if his intent to steal from the decedent's body was formed after the killing." Id. at 461, 463 (citing State v. Lopez, 187 N.J. 91, 101 (2006)). Thus, "to establish accomplice liability in a robbery case, the [Criminal] Code requires that the State prove that an accomplice shared the principal's intent to commit the theft before or at the time the theft or attempted theft was committed." Id. at 464. The Court concluded the trial court had an obligation to instruct the jury on both the underlying substantive charge and accomplice liability, "but also to dispel the tantalizingly simple but mistaken legal theory" on afterthought robbery, and the failure to so instruct the jury constituted plain error. Id. at 465.

Whitaker is inapposite because here, the State did not parse out defendant's liability in the same way. Rather, it alleged he was an active participant throughout the course of the robbery, which led to Fazzio's death. Since the facts of this case did not suggest afterthought robbery, the trial judge was not required to give the same instruction as in Whitaker.

The trial judge erred when she did not instruct the jury on accomplice liability for first-degree robbery. N.J.S.A. 2C:15-1 states:

> a. Robbery defined. A person is guilty of robbery if, in the course of committing a theft, he:
>
> > (1) Inflicts bodily injury or uses force upon another; or
> >
> > (2) Threatens another with or purposely puts him in fear of immediate bodily injury; or
> >
> > (3) Commits or threatens immediately to commit any crime of the first or second degree.
> >
> > An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.
>
> b. Grading. Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

As we explained, the jury instruction for robbery first outlined the elements of robbery, and then separately listed the elements needed to find defendant guilty of first-degree robbery. The verdict sheet followed suit. The jury acquitted defendant of robbery and did not answer the corresponding question on the verdict sheet to determine first-degree liability.

The instruction on accomplice-liability robbery, immediately followed the robbery instruction, but only included the elements for second-degree robbery and did not provide an additional instruction on how to find defendant guilty of first-degree robbery as an accomplice. The corresponding question on the verdict sheet only asked if the jury found defendant not guilty or guilty "[o]n the charge of Liability for the Conduct of Another for Robbery," without including a follow-up question to distinguish the degree. The jury found defendant guilty of this count. At sentencing, the trial judge confirmed she was sentencing defendant to accomplice liability for first-degree robbery, and defendant's judgment of conviction listed his conviction accordingly.

We note the indictment included language for both first- and second-degree robbery, as did the indictment for accomplice-liability robbery. Moreover, the parties acknowledged this point during the charging conference, albeit just for the robbery offense.

For these reasons, we reject defendant's assertion the State never argued second-degree liability. We conclude the charge on accomplice liability for first-degree robbery was deficient. The failure to charge the jury on an element of an offense is presumed to be prejudicial error, even in the absence of a request by defense counsel. State v. Afanador, 151 N.J. 41, 56 (1997); see also State v.

Frederico, 103 N.J. 169, 176 (1986) ("[A] mandatory duty exists on the part of the trial judge to instruct the jury as to the fundamental principles of law which control the case," such as the definition of the crime, and this "duty is not affected by the failure of a party to request that it be discharged."). "The verdict sheet, in conjunction with the jury charges, constitutes the trial court's direction to the jury." Galicia, 210 N.J. at 386.

While the jury could have considered the trial court's instruction on own-conduct robbery, both the judge's instruction and the verdict sheet did not identify the difference between first- and second-degree robbery. Indeed, had the error been only on the verdict sheet, but the instruction proper, we could deem it harmless. Id. at 387. It was not. The mutual errors left the jury without clear guidance on whether they were to consider convicting defendant of a first-degree offense, and how to reach that finding.

In State v. Casilla, 362 N.J. Super. 554 (App. Div. 2003), we faced a similar issue. There, the jury was not instructed on the element distinguishing between first- and second-degree kidnapping and it returned a guilty verdict. Id. at 567. The trial court then sentenced the defendant for first-degree kidnapping. Ibid. The State alleged the victim owed money to drug dealers, the defendant and others kidnapped the victim to help collect the money owed, they attempted

41

to extort the victim's family for ransom, and then shot the victim and burned him in a car. Id. at 558-59. Since the jury had also found the defendant guilty of felony murder, the State argued the jury "implicitly found" the uncharged element that would raise the conviction to first-degree kidnapping—that the victim was not released unharmed. Ibid.

We concluded the jury's conviction on the felony murder count meant it found the victim was not released unharmed but declined to infer that the jury indeed had reached that finding. Id. at 569. Therefore, we vacated the defendant's conviction for first-degree kidnapping. Id. at 570. However, because the trial court had properly instructed the jury on second-degree kidnapping and the jury found defendant guilty of kidnapping, it was appropriate to mold the judgment of conviction to second-degree kidnapping, as this "simply memorialize[d] the jury's verdict." Id. at 571. We added that our law has viewed "the appropriateness of molding jury verdicts in criminal cases" with more liberality. Id. at 570 (citing State v. Farrad, 164 N.J. 247, 265-66 (2000)). Furthermore, if we reversed and remanded for a new trial, the State's attempt "to retry defendant for first-degree kidnapping after a jury has returned a valid verdict for second-degree kidnapping could present serious double jeopardy issues." Id. at 571 (citing State v. Dively, 92 N.J. 573, 578-87 (1983); State v.

<u>Wolf</u>, 46 N.J. 301, 303 (1966)). We concluded the appropriate course was to remand for sentencing for second-degree kidnapping. <u>Casilla</u>, 362 N.J. at 571; <u>see also</u> <u>State v. Paden-Battle</u>, 464 N.J. Super. 125, 138-39, 152-53 (App. Div. 2020) (vacating the defendant's conviction for first-degree kidnapping, modifying the conviction to second-degree robbery to reflect the jury's verdict, and remanding for re-sentencing where the jury was not adequately instructed on first-degree kidnapping but was properly charged with the elements to find second-degree kidnapping).

Here, the trial judge charged all the elements for second-degree robbery, and the jury convicted defendant of the offense. For these reasons, we vacate defendant's conviction for first-degree accomplice-liability robbery, and remand to the trial judge to revise the judgment of conviction to reflect defendant's conviction on accomplice-liability second-degree robbery.

We reject defendant's claim that the errors we have addressed warrant reversal of his conviction on the accomplice liability for the felony murder conviction. This argument lacks merit because the jury's verdict supports a conviction for accomplice liability for second-degree robbery, which is sufficient to support the felony murder conviction. <u>See</u> N.J.S.A. 2C:11-3(a)(3) (listing robbery as a predicate offense to felony murder).

## III.

In point III, defendant contends there was a two-week break in deliberations, which deprived him of a fair trial. He claims the extended break likely exposed the jury to outside influences and impacted their ability to recall specific aspects of the evidence and testimony, violating his right to a fair and impartial jury. Defendant asserts that allowing a two-week break in the middle of deliberations was an abuse of discretion, especially because the delays were not caused by sudden or unanticipated events, but planned vacations. He argues this mandates reversal of his convictions.

Initially, we note the appellate record does not include the jury selection transcript and whether prospective jurors were informed of the estimated length of the trial. However, this does not prevent our review because the break in deliberations was due to unforeseen circumstances after the jury was empaneled.

The trial commenced on October 4, 2021, continued for nine non-consecutive dates, and concluded on October 25, 2021. Summations occurred the following day, as did the final jury instructions. Because of the late hour, the jury did not start deliberations on October 26. The trial judge noted she initially planned for the jury to deliberate four days that week (Monday, Tuesday, Thursday, and Friday), but the jury was not scheduled to return until

Thursday. She inquired whether the jury was available to begin deliberations the next day, Wednesday, which previously had not been scheduled as a court date. Several jurors indicated they were unavailable.

Therefore, deliberations began on Thursday, October 28, 2021, continued October 29, and November 1. On November 1, the judge noted court was closed the following day for Election Day and inquired about counsel's availability for the rest of the week, starting Wednesday. Counsel responded they were available on Wednesday, but defense counsel stated she could not appear on Thursday and Friday. She also noted that, during jury selection, the court told the prospective jurors they would not sit those days due to vacation. Counsel thus surmised some jurors would also be unavailable those days.

The prosecutor suggested the matter return on the next earliest date, even if it was a Monday, when the judge was on vacation, and inquired whether another judge could preside during deliberations. Some jurors also were not available for the rest of the week and the following week, due to pre-planned vacations. The judge advised if the jurors were not available on November 3, they would not return until November 16, or 29. The State again asked if another judge could preside on November 8, but the trial judge advised no other judge was presently available.

A-3324-21

Five jurors could not appear on November 3. The judge said the deliberations would therefore continue either November 8, or 16, and adjourned the matter until November 8.

Deliberations did not resume until November 16.[2] A juror was unable to continue deliberating following the two-week break and was replaced by an alternate. The jury was then instructed to begin their deliberations anew. Deliberations continued November 18, at which point another juror withdrew due to COVID-19 protocols, and that juror was replaced by an alternate. Deliberations continued November 19, at which point the jury reached a verdict.

Because the defense never objected to the lengthy gaps in between deliberations, our review is for plain error under Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-87 (2022). Under this standard, "[t]he mere possibility of an unjust result is not enough." Funderburg, 225 N.J. at 79. "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389-90 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

---

[2] The record does not explain why deliberations did not resume on November 8.

Given the fundamental guarantee of the right to a jury trial, "[a]s the guardian of that guarantee, the trial judge is entrusted with the responsibility of controlling courtroom proceedings and is bounded by the law and the rules of the court." State v. Dorsainvil, 435 N.J. Super. 449, 480 (App. Div. 2014) (citing State v. Tedesco, 214 N.J. 177, 188-89 (2013)). However, trial judges have substantial discretion in controlling their own calendar. State v. Miller, 216 N.J. 40, 65 (2013). Once deliberation begins, it is within the court's discretion to "permit the dispersal of the jury for the night, for meals, and during other authorized intermissions in the deliberations." R. 1:8-6(b).

We have affirmed a trial court's declaration of a mistrial where the COVID-19 pandemic threatened to cause a delay in deliberations spanning several months. State v. Smith, 465 N.J. Super. 515, 539 (App. Div. 2020). Other courts have deferred to a trial court's declaration of a mistrial where the court found a "jury's attention span could not withstand" a two-week delay mid-trial. United States v. Chapman, 524 F.3d 1073, 1083 (9th Cir. 2008).

Defendant points us to another case from the Ninth Circuit, albeit a state court case, People v. Santamaria, 229 Cal. App. 3d 269, 277-78 (Cal. Ct. App. 1991), where an appellate court concluded the suspension of jury deliberations for an eleven-day period to accommodate holidays and the court's vacation

47

schedule "exceeded the bounds of reason." There, the court considered the absence of good cause for the delay, as well as the timing and duration of the deliberations, and concluded it "risk[ed] prejudice to the defendant both from the possibility that jurors might discuss the case with outsiders at this critical point in the proceedings, and from the possibility that their recollections of the evidence, the arguments, and the court's instructions may become dulled or confused." Ibid.

Initially, we note we are not bound by Chapman or Santamaria. Perhaps more importantly is that there is no indication the delay here adversely impacted the jury's ability to evaluate the evidence or had colored their opinions. Prior to the break on November 1, 2021, the trial judge reminded the jury of their responsibilities to refrain from discussing the case among themselves or with friends and family, reviewing any news reports about the case, or engaging in any outside investigation. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007) (citing State v. Nelson, 155 N.J. 487, 526 (2007)).

There is no evidence the jury violated their oath, could not recall the evidence presented, or allowed themselves to be prejudiced by outside forces as defendant hypothesizes. If anything, the record points in the opposite direction

as the jury acquitted defendant of several offenses, evidencing a thoughtful deliberation. The delay here developed organically because of legitimate reasons why either counsel or members of the jury could not be in court and included an intercession of two federal holidays, Election Day and Veterans Day, which undoubtedly created more delay. For these reasons, we conclude the delay did not constitute plain error requiring us to vacate the verdict.

## IV.

In point IV, defendant urges us to vacate his sentence because the trial judge's findings under the aggravating and mitigating factors were not supported by competent, credible evidence, or a sufficient explanation of her findings. He asserts his sentence was excessive because the judge "was confused as to the range of possible sentences for robbery and the required minimum terms for each offense," and which offenses were subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge also improperly sentenced defendant on offenses that were merged.

A sentencing decision is reviewed under a "highly deferential standard." State v. Canfield, 470 N.J. Super 234, 343 (App. Div. 2022). We consider:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible

A-3324-21

evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."

[Ibid. (quoting State v. Liepe, 239 N.J. 359, 371 (2019))].

The sentencing court must explain its reasons for imposing the sentence, including "the factual basis supporting a finding of particular aggravating or mitigating factors affecting [the] sentence." R. 3:21-4(h).  It must identify and balance the relevant aggravating and mitigating factors in N.J.S.A. 2C:44-1(a) and (b) and state the reasons for its findings.  State v. Bieniek, 200 N.J. 601, 608 (2010).

In sentencing a defendant, a trial court need not "explicitly reject" each aggravating and mitigating factor argued by the parties.  Id. at 609 (citing State v. Pillot, 115 N.J. 558, 565-66 (1989)).  "It is sufficient that the trial court provides reasons for imposing its sentence that reveal the court's consideration" of the applicable factors.  Ibid. (citing Pillot, 115 N.J. at 565-66).  In addition to this qualitative assessment, "[t]o facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence."  State v. Case, 220 N.J. 49, 64-65 (2014).  This includes citing a "factual basis" to support each applicable aggravating or mitigating factor.  R. 3:21-4(g).  While a trial court's sentencing determination is entitled to deference, if it "fails to identify relevant

aggravating and mitigating factors, or merely enumerates them, or forgoes a qualitative analysis, or provides little 'insight into the sentencing decision,' then the deferential standard will not apply." Case, 220 N.J. at 65 (citing State v. Kruse, 105 N.J. 354, 363 (1987)).

The trial judge sentenced defendant to forty years in prison, subject to an eighty-five percent period of parole ineligibility, for his conviction of accomplice-liability felony murder. She initially sentenced defendant to ten years subject to NERA for the first-degree accomplice liability for robbery. The judge sentenced defendant to a four-year term for theft, but then merged that conviction into his accomplice liability for robbery conviction. Defendant received seven years for reckless manslaughter and seven years for accomplice-liability manslaughter, and the judge then merged the accomplice-liability reckless manslaughter conviction into the reckless manslaughter conviction. The judge did not merge defendant's convictions for theft, accomplice-liability robbery, reckless manslaughter, and accomplice-liability reckless manslaughter into his accomplice liability for felony murder conviction, despite the fact the parties agreed, and instead imposed separate sentences, declaring "[e]verything runs concurrent."

The trial judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk of re-offense. She gave "moderate weight" to aggravating factor six, N.J.S.A. 2C:44-1(a)(6), because defendant's prior criminal record included a disorderly persons conviction from 2016, and receiving stolen property in 1991, both of which resulted in a sentence of probation. The judge gave aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), the need to deter defendant and others from violating the law, "significant weight" noting it is "always an important message in reference to future offenses, particularly any crime of this nature."

The trial judge gave mitigating factor seven, N.J.S.A. 2C:44-2(a)(7), "moderate weight" because defendant "led a law-abiding life for a substantial period of time." She gave slight weight to mitigating factor eight, N.J.S.A. 2C:44-2(a)(8), because the conduct was the result of circumstances unlikely to reoccur. The judge concluded the aggravating factors significantly outweighed the mitigating factors.

The trial judge's analysis of the aggravating and mitigating factors was limited and deprives us of the means to understand her thought process. She did not explain how defendant was at risk to re-offend, and did not explain either the specific or general deterrence to support her findings of aggravating factors three and nine, respectively.

A-3324-21

The trial judge's application of aggravating factor nine and mitigating factor eight seem contradictory. Although our law does not hold that these factors can never be found together, State v. Fuentes, 217 N.J. 57, 80 (2014), the judge did not give her reasoning for finding these factors. The same issue arises regarding her finding of mitigating factor seven and aggravating factor three. While both factors can "coexist," the judge must make the necessary findings to enable us to understand her logic. Case, 220 N.J. at 67.

Similarly, the judge should explain why she gave aggravating factor six "moderate weight" considering defendant's prior criminal history was compromised of two non-indictable offenses. This seemingly contradicted the judge's finding of mitigating factor seven.

We reject defendant's argument the felony murder sentence was facially excessive. The sentencing range for felony murder ranges from thirty years to life in prison. N.J.S.A. 2C:11(3)(b). Defendant received a forty-year sentence for this offense. Sentencing judges may consider sentencing a defendant at the mid-point of the sentencing range, and then deviate towards the higher or lower end of the range depending on its balancing of the mitigating and aggravating factors. Fuentes, 217 N.J. at 73. Regardless, we remand the felony murder

sentence for reconsideration because the judge must make more fulsome findings on the aggravating and mitigating factors as discussed above.

The trial judge also erred because the convictions for theft, accomplice-liability robbery, reckless manslaughter, and accomplice-liability reckless manslaughter should have been merged into the accomplice-liability felony murder conviction for purposes of sentencing. Our review of this issue is de novo. State v. Herrera, 469 N.J. Super. 559, 565 (App. Div. 2022).

N.J.S.A. 2C:1-8(a) states:

> a. When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
>
>> (1) One offense is included in the other, as defined in subsection d. of this section;
>>
>> . . . .
>>
>> (4) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct.
>
> . . . .
>
> d. Conviction of included offense permitted. A defendant may be convicted of an offense included in an offense charged whether or not the included offense is an indictable offense. An offense is so included when:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged . . . .

"The overall principle guiding merger analysis is that a defendant who has committed one offense cannot be punished as if for two." State v. Hill, 182 N.J. 532, 542 (2005) (quoting State v. Brown, 138 N.J. 481, 561 (1994)). "[A]lthough our Supreme Court has 'not determined whether that prohibition rests on principles of double jeopardy, due process or some other legal tenet,' it is beyond dispute that 'merger implicates a defendant's substantive constitutional rights.'" Herrera, 469 N.J. Super. at 565 (first quoting State v. Cole, 120 N.J. 321, 326 (1990), then quoting State v. Miller, 109 N.J. 112, 116 (1987)). Thus, "[c]onvictions for lesser-included offenses, offenses that are a necessary component of the commission of another offense, or offenses that merely offer an alternative basis for punishing the same criminal conduct will merge." Hill, 182 N.J. at 542 (quoting Brown, 138 N.J. at 561).

Here, the predicate offense for felony murder and the accomplice-liability robbery, should merge with the felony murder conviction. See Hill, 182 N.J. at 541, 547-48 (holding the predicate offense should merge with the felony murder conviction at sentencing, albeit in the context of a more complicated scenario involving two predicate felony convictions).

A-3324-21

Moreover, "there cannot be two homicide convictions for the death of one victim." State v. Pantusco, 330 N.J. Super. 424, 444-45 (App. Div. 2000) (mandating the aggravated manslaughter conviction be merged into the felony murder conviction). For these reasons as well, the judge should have merged defendant's reckless manslaughter conviction into the felony murder.

V.

In conclusion, defendant's convictions are affirmed, except that his conviction for first-degree robbery is vacated. The balance of defendant's sentence is vacated and remanded for reconsideration.

Affirmed in part, vacated and remanded in part for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3324-21